MURDOCK, Justice.
The issues l-aised by this petition for a writ of mandamus are: (1) whether law-enforcement activities and litigation pursued by attorneys and other officers who are otherwise appropriately authorized by the governor to do so are “nullities” without the approval of the attorney general or the local district attorney and (2) whether the attorney general has the right to as *707 sume control of such activities and litigation. Because we answer both questions in the negative, we grant the petition and issue the writ of mandamus.

I. Facts and, Procedural History

Cornerstone Community Outreach, Inc. (“Cornerstone”), obtained a license from the Town of White Hall in Lowndes County to conduct games of bingo. The basis for Cornerstone’s license was a local constitutional amendment that authorizes charity bingo games. Amendment No. 674, Ala. Const. 1901 (Local Amendments, Lowndes County, § 3, Ala. Const. 1901 (OffRecomp.)), states: “The operation of bingo games for prizes or money by nonprofit organizations for charitable, educational, or other lawful purposes shall be legal in The Town of White Hall....” Purportedly on the basis of its license and this local amendment, Cornerstone opened and operated what is known as the White Hall Entertainment Center (“the EC”).
In December 2008, Governor Bob Riley issued Executive Order No. 44 creating the Governor’s Task Force on Illegal Gambling (“the Task Force”). In part, Executive Order No. 44 states:
“WHEREAS, Article IV, Section 65 of the Constitution of Alabama of 1901 provides: ‘The legislature shall have no power to authorize lotteries or gift enterprises for any purposes, and shall pass laws to prohibit the sale in this state of lottery or gift enterprise tickets, or tickets in any scheme in the nature of a lottery ...;’ and
[[Image here]]
“WHEREAS, the Supreme Court of Alabama has held that bingo is a form of lottery and is therefore illegal in Alabama, except where expressly authorized by a constitutional amendment. See City of Piedmont v. Evans, 642 So.2d 435, 436-37 (Ala.1994); and the conduct of bingo, within specified parameters, is authorized in 16 counties and two municipalities by local constitutional amendments, none of which,, however, defines ‘bingo;’ and
“WHEREAS, in 1997, in a unanimous opinion authored by now-Chief Justice Sue Bell Cobb, the Alabama Court of Criminal Appeals ruled that where bingo is authorized but not otherwise defined by local constitutional amendment, ‘bingo’ means nothing other than ‘the ordinary game of bingo;’ the Court upheld the appellant’s conviction and 12-month prison sentence for promoting gambling and possession of a gambling device where the appellant had contended that the gambling activity he operated was ‘bingo’ within the meaning of the local constitutional amendment and local ordinance; and the Court, acknowledging ‘this state’s strong public policy against lotteries as expressed in § 65 of the Alabama Constitution,’ declared that bingo is a ‘narrow exception to the prohibition of lotteries in the Alabama Constitution’ and, accordingly, held that ‘no expression in [an] ordinance [governing the operation of bingo] can be construed to include anything other than the ordinary game of bingo ’ lest the ordinance be ‘inconsistent with the Constitution of Alabama.’ See Foster v. State, 705 So.2d 534, 537-538 (Ala.Crim.App.1997) (emphasis added); and
[[Image here]]
“WHEREAS, it is common knowledge that, notwithstanding the clear holding of Foster, there is occurring at sites across this State, under the name of ‘bingo, ’ gambling activity which no reasonable observer could assert in good faith to be ‘the ordinary game of bingo, ’ particularly slot-machine style gambling in which an electronic device or system automatically processes an instant game of virtual ‘bingo’ upon activation and a *708 wager by the human player, the outcome of which is based predominantly on chance rather than on any meaningful human interaction or skill; and
“WHEREAS, regardless of the ‘game’ in question, the possession of slot machines and gambling devices is illegal in all 67 counties in Alabama pursuant to Section ISA-12-27, Code of Alabama 1975, which provides: ‘A person commits the crime of possession of a gambling device if with knowledge of the character thereof he manufactures, sells, transports, places or possesses, or conducts or negotiates any transaction affecting or designed to affect ownership, custody or use of: (1) A slot machine; or (2) Any other gambling device, with the intention that it be used in the advancement of unlawful gambling activity;’ and
“WHEREAS, none of the local constitutional amendments relating to bingo exempts bingo operators from the State’s criminal laws against slot machines and other gambling devices; and
[[Image here]]
“WHEREAS, in 2006, the Supreme Court of Alabama ruled that machines which ‘look like, sound like, and attract the same class of customers as conventional slot machines, and, when integrated with the servers, serve essentially the same function as [] slot machines,’ are illegal slot machines and further reaffirmed that ‘Alabama’s gambling law ... is not so easily evaded. It is “the policy of the constitution and laws of Alabama [to prohibit] the vicious system of lottery schemes and the evil practice of gaming, in all their protean shapes.” ’ Barber v. Jefferson County Racing Association, Inc., 960 So.2d 599, 614 (Ala.2006) (emphasis added) (citations omitted); and
“WHEREAS, notwithstanding the Alabama Supreme Court’s clear, emphatic, and repeated remonstrations against every artful attempt to circumvent Alabama’s anti-gambling laws, there is an obvious lack of uniformity in the enforcement of these laws from county to county — a state of affairs which has produced serious confusion about which activities are lawful and which are not, and which is being exploited by gambling’s promoters to expand and entrench illegal gambling activity in Alabama;
“NOW THEREFORE, I, Bob Riley, Governor of the State of Alabama, by virtue of the authority vested in me by the Constitution and, laws of Alabama, and for other good and valid reasons, which relate thereto, do hereby establish the Governor’s Task Force on Illegal Gambling for the purpose of promoting and supporting uniform statewide enforcement of Alabama’s anti-gambling laws and to carry out the Alabama Constitution’s strong public policy against lottery schemes and illegal gambling.
“BE IT FURTHER ORDERED, that the Task Force shall be composed of the Director of the Department of Public Safety and such agents and investigators as he or she shall designate[1] the Administrator of the Alcoholic Beverage Control Board and such agents and investigators as he or she shall *709 designate[2] and a supernumerary district attorney, who shall be appointed by the Governor as a Special Prosecutor and who shall serve as the Task Force Commander.
“BE IT FURTHER ORDERED, that the Task Force shall serve as a resource for local prosecutors and law enforcement officials who request assistance in the investigation and prosecution of gambling-related crimes. The Task Force may provide technical assistance, investigative support, law enforcement personnel, and any other assistance requested by local authorities reasonably necessary to enforce Alabama’s anti-gambling laws.
“BE IT FURTHER ORDERED, that the Special Prosecutor, pursuant to Section 12-17-216, Code of Alabama 1975, shall have statewide jurisdiction and is hereby authorized, with the support of the Task Force, to conduct investigations, attend any regular, adjourned or special session of any circuit court in any of the judicial circuits of Alabama for the investigation of or the prosecution of any criminal case or the prosecution or defense of any case related to gambling activity in the State of Alabama.”
(Emphasis added, other than as indicated.) See Ala.Code 1975, § 36-13-9 (governor’s power to issue executive orders).
By letter dated December 29, 2008, Governor Riley appointed former Jefferson County District Attorney David Barber as eommander of the Task Force. The letter of appointment to Barber stated:
“Based upon your position as a supernumerary district attorney, I also formally request that you provide assistance to this Office as a special prosecutor in the investigation and prosecution of illegal gambling activity throughout the State of Alabama, pursuant to Section 12-17-216 of the Code of Alabama.
“By copy of this letter to the Attorney General, the Chief Justice, the Administrative Office of Courts, and the District Attorney’s Association, I am informing each of them of this request that you assume active status pursuant to the above-referenced statutory provisions.”
In March 2009, agents of the Task Force obtained a search warrant relating to the alleged illegal gambling operations at the EC, executed a search at the EC, and confiscated approximately 105 electronic-gaming machines, the computer servers to which those machines were attached, over $500,000 in proceeds from the games played at the EC, and various records kept by Cornerstone.[3]
A few hours after the execution of the warrant began, Cornerstone filed an action (“the declaratory-judgment action”) in the Lowndes Circuit Court against Governor Riley, in his official capacity; Barber, as supernumerary district attorney and special prosecutor for the Task Force; Emory Folmar, as administrator of the Alcoholic Beverage Control Board; and Colonel *710 Christopher Murphy, as director of the Department of Public Safety (collectively “the Riley defendants”). Cornerstone sought, among other things, a declaratory judgment and preliminary and permanent injunctive relief regarding the Task Force’s seizure of the electronic-gaming machines. Specifically, Cornerstone requested a judgment declaring that those machines and the enterprise being conducted at the EC were permitted under Amendment No. 674, Ala. Const.1901. Cornerstone requested a preliminary injunction restraining the Task Force from any further interference with its operation at the EC during the pendency of the action and directing the Task Force to return all the seized machines, servers, and records based on its belief that the machines are legal under Alabama law. The Riley defendants filed a counterclaim seeking a judgment declaring that under Alabama law the machines at issue were illegal gambling devices.
Freedom Trail Ventures, Ltd. (“FTV”), subsequently filed a motion to intervene in the declaratory-judgment action, alleging that it owned at least some of the machines seized by the Task Force and that it had leased those machines to Cornerstone. The trial court granted FTV’s motion.
After conducting a hearing on Cornerstone and FTV’s request for a preliminary injunction, the trial court granted that request and entered an order purporting to require the Riley defendants to return all property seized as a result of the execution of the March 2009 search warrant. The trial court also ordered the Riley defendants to refrain from interfering with Cornerstone’s operation at the EC during the pendency of the declaratory-judgment action.
The Riley defendants appealed to this Court from the trial court’s order issuing the preliminary injunction.
In April 2009, Barber, as supernumerary district attorney, filed a forfeiture proceeding (“the forfeiture proceeding”) on behalf of the State of Alabama in the Lowndes Circuit Court. The State sought forfeiture of the items seized during the execution of the March 2009 warrant on the EC. The State’s petition in the forfeiture proceeding alleged that Cornerstone and FTV claimed an interest in. the property at issue.[4] The trial court entered an order consolidating the declaratory-judgment action and the forfeiture proceeding.
In November 2009, this Court reversed the trial court’s judgment granting Cornerstone and FTV a preliminary injunction in the declaratory-judgment action. Consistent with the legal authority cited by Governor Riley in Executive Order No. 44, we held that the game of bingo authorized by the local amendment was that game commonly and traditionally known as bingo, and we provided a nonexhaustive list of characteristics of that game. Based on our legal conclusion as to the meaning of the term “bingo,” we determined that the trial court’s award of a preliminary injunction was in error because there was no reasonable likelihood of success on the merits. Barber v. Cornerstone Cmty. Outreach, Inc., 42 So.3d 65, 87 (Ala.2009).
Barber thereafter resigned as commander of the Task Force. In January 2010, Governor Riley issued an order amending Executive Order No. 44. The amending order states:
“BE IT FURTHER ORDERED that the Governor, whenever he deems it proper or necessary, may alter the membership of the Task Force by removing any member thereof, filling any *711 vacancy, or appointing additional members thereto, as he sees fit, and may appoint any member to serve as Task Force Commander.
“BE IT FURTHER ORDERED that in addition to or in lieu of any other appointments authorized or contemplated by Executive Order Number 44 or under applicable law, and pursuant to Section 12-17-184(10), Code of Alabama 1975, the Governor may appoint and authorize any district attorneys and any assistant district attorneys in the State of Alabama to serve as Special Prosecutor or Assistant Special Prosecutors and, as such, ‘[t]o go to any place in the State of Alabama and prosecute any case or cases, or work with any grand jury, ... and to attend sessions of courts and transact all of the duties of the district attorney in the courts’ with respect to any investigations or cases relating to gambling activity in the State of Alabama.
[[Image here]]
“BE IT FURTHER ORDERED that no provision of Executive Order Number 44 shall be construed as limiting the jurisdiction or the authority of the Special Prosecutor, an Assistant Special Prosecutor, or the Task Force or its members, to fulfill their responsibilities under applicable law, including those assigned by the Governor pursuant to relevant statutory or constitutional authority.”
Thereafter, Governor Riley issued a letter appointing Mobile County District Attorney John M. Tyson, Jr., as commander of the Task Force. The appointment letter states:
“I formally request that you serve as Special Prosecutor and counsel for the Task Force in all cases involving the Task Force or its enforcement of laws regarding illegal gambling, and that you go to any place in the State of Alabama and attend to and prosecute each such case, work with any grand jury in any such case or when otherwise called upon to do so by the Governor of the State of Alabama, and attend sessions of court and transact all of the duties of the district attorney in the courts in all such cases, and in any others whenever called upon by the Governor to do so, pursuant to Section 12 — 17—184(10) of the Code of Alabama (1975).
“I also formally request that you appear as Special Prosecutor and counsel for the Task Force in the trial and appellate courts and before all magistrates and judges in all cases or proceedings involving the Governor’s Task Force on Illegal Gambling or its law enforcement activities regardless of where in the State of Alabama the cases or proceedings may occur or be initiated, and regardless of what appellate courts may hear appeals or petitions for writs in such cases.”[5]
Tyson, Martha Tierney, an assistant district attorney for Mobile County whom Governor Riley also appointed to serve as special prosecutor and counsel for the Task Force pursuant to § 12-17-184(10), and Edgar W. Greene, a supernumerary district attorney whom Governor Riley appointed to serve with the Task Force pursuant to Ala.Code 1975, § 12-17-216, filed notices of appearance in the declaratory-judgment action and the forfeiture proceeding.
Cornerstone and FTV filed motions to dismiss the State’s forfeiture proceeding on the ground that the State and its prosecutors lacked the legal authority to pursue it.
On March 5, 2010, Governor Riley appointed Supernumerary District Attorney *712 Tim Morgan to the Task Force. The letter appointing Morgan states:
“This letter further confirms that you are and have been requested, appointed, and authorized to institute, conduct, and appear in any civil or criminal legal proceeding in any court, including the Supreme Court of Alabama, the Court of Civil Appeals, and the Court of Criminal Appeals, in order to protect and defend the State of Alabama’s ‘public policy ... emphatically declared against lotteries, or any scheme in the nature of a lottery,’ both by Constitution and by statutes; to carry out the purposes and objectives of the Task Force on Illegal Gambling; and to represent the State of Alabama, the Governor, the Task Force, the members of the Task Force, including yourself, and any agency, department, or instrumentality of the State of Alabama in any litigation in any court or tribunal related to any suspected illegal gambling activity or operation in the State of Alabama.
“This request, appointment, and authorization was and is made in furtherance of my constitutional duty to ‘take care that the laws be faithfully executed,’ Ala. Const, art. V, § 120; and pursuant to my constitutional authority as ‘chief magistrate’ of the State under Ala. Const, art. V, § 113, and my statutory authority under Ala.Code. §§ 12-17-216, 12-17-184(10), 36-13-2, 41-15B-2(i), and any other relevant statutory or constitutional authority. Insofar as current and future litigation involving gambling is concerned, and until further notice, your authority includes all powers available to an assistant attorney general, a supernumerary district attorney, and an attorney appointed under the foregoing statutes, separately and severally.”
(Footnote and citations omitted.)
On March 8, 2010, the trial court entered an order in which it noted that neither Attorney General Troy King nor a member of his staff had participated in the execution by the Task Force of the search warrant on the EC and that Lowndes County District Attorney John Andrews likewise had not participated. The trial court also noted that Andrews had submitted an affidavit in which he stated that he had inspected the gaming machines at the EC before it opened, that he had “exercised [his] prosecutorial judgment and discretion in deciding not to bring any criminal charges relating to such games,” and that he had never been contacted by the Task Force to discuss investigating or closing the EC. The order went on to state:
“While several officials have the apparent right to request or designate a supernumerary attorney general to perform duties under Ala.Code § 12-17-216, this Court concludes that any such person so designated may perform such duties only subject to the direction and control of the Attorney General. This statute does not enable a supernumerary district attorney to act beyond the Attorney General’s authority. It must be remembered that the Attorney General may direct and control the actions and positions of district attorneys throughout the State. See, e.g., Ala. Code §§ 36-15-14, 36-15-15 & 36-15-21; see also Graddick v. Galanos, 379 So.2d 592, 594 (Ala.1980). To somehow give a supernumerary district attorney unfettered independence from this control makes no sense.
“Indeed, to use Ala.Code § 12-17-216 in an effort to create a new kind of prosecutor, who acts purportedly on behalf of the State but who is answerable to anyone other than the Attorney General, would fly in the face of authorities such as [Ex parte Weaver, 570 So.2d 675 (Ala. *713 1990), Chapman v. Gooden, 974 So.2d 972 (Ala.2007),] and the above-referenced statutes conveying broad powers to the Attorney General over litigation involving the State. Given such powers as have historically been given to the Attorney General, which Ala.Code § 36-15-1.1 explicitly confirms, such an interpretation of Ala.Code § 12-17-216 is untenable.
“While the Attorney General has not appeared in these actions, this Court has reviewed the Attorney General’s amicus curiae brief submitted to the Supreme Court. From that, the inescapable conclusion is that in filing the Answer and Counterclaim in the Declaratory Judgment Action, the Petition in the Forfeiture Action, and all other filings in these actions, attorney Bather did so without express authorization of the Attorney General. Such filings must thus be regarded as a nullity, just as if they had been filed by a private citizen who claimed to represent the State.
“Further, while the appearance of attorneys Tyson and Tierney in these cases is under a different statute, Ala.Code § 12-17-184(10), the same result applies. Lowndes County has a District Attorney who has not recused himself and who has in fact looked into this matter, deciding not to pursue litigation. The only officer who can second-guess the district áttorney in this regard is the Attorney General. The Governor lacks the authority to create his own prosecutor whenever a district attorney takes a legal position that is not to his liking. While Ala.Code § 12-17-184(10) authorizes the Governor to designate a district attorney (or an assistant district attorney) to go anywhere in the state in the performance of statutorily-defined duties, it again must be remembered that the Attorney General retains ultimate authority, as discussed above. Particularly when a' district attorney is requested to go into another county, the orderly exercise of such authority is crucial to avoid the chaos arising from conflicting legal positions.

“Accordingly, the attorneys who have appeared for the [State and the Riley defendants] may not continue to represent these parties in the Declaratory Judgment Action, nor may they prosecute the Forfeiture Action, unless the Attorney General expressly ■ ratifies what they have done up to this point and authorizes them to continue in this representation.

“The Attorney General has — for whatever reason — assumed a curious stance. While complaining of the Governor’s actions in the Supreme Court, and in the media, the Attorney General has made no effort to defend the State’s interests in these cases. He is under a duty to do so. Ala.Code § 36-15-1(2) provides in part that the Attorney General ‘shall attend to all cases other than criminal that may be pending in the courts of this state, in which the state maybe in any manner concerned.... ’ (emphasis added). Further, under Ala.Code § 36-15-21, ‘[a]ll litigation concerning the interest of the state, or any department of the state, shall be under the direction and control of the Attorney General’ (emphasis added). Especially since these cases involve claims raised against the Governor and the heads of two state agencies, these statutory obligations may not be ignored.
“The Attorney General is therefore directed to assume ‘the direction and control’ of the State’s interests in these cases. This Court, of course, may not dictate what the Attorney General’s decisions must be; as .the Weaver decision makes clear, such decisions are pursuant to the Attorney General’s prerogative. *714 This Court can, however, direct the Attorney General to come in off the sidelines and decide how the State’s interests are best represented in these cases. “Accordingly, by March 22, 2010, the Attorney General is to advise the Court and the parties of his position, in view of this order and of his statutory duties described above. The Court will thereafter determine the course of further proceedings in these related cases.”
The Riley defendants and the State filed with this Court a petition for a writ of mandamus directing the trial court to vacate its March 8 order on the grounds that a district attorney or supernumerary district attorney serving at the governor’s direction can pursue the interests of the State in litigation without the approval of the attorney general.
The Riley defendants and the State also filed a motion in the trial court requesting that 'it stay its March 8 order pending a decision on their petition. In their motion, they argued, in part, that the gubernatorially appointed attorneys for the Riley defendants and the State had authority to appear in the actions, that the order “raises substantial separation-of-powers issues and directs' the Attorney General to perform an act he has discretion not to perform,” and that if a justiciable conflict existed between the attorney general and governor, the governor would have the right to direct the litigation in the actions. Also, the Riley defendants and the State noted:
“As of now, there is no conflict between the Attorney General and the Governor: the Attorney General has allowed the Task Force Special Prosecutors to proceed and has not intervened in or superintended this case. By purporting to force the Attorney General to intervene, the Order risks creating the executive-branch conflict that it has attempted to avert. The Order also takes the unprecedented step of ordering the Attorney General to superintend a case he has decided not to superintend.”
On March 16, 2010, the trial court issued an order ruling on the motion to stay. The order states:
“In arguing that the March 8 order should be stayed, the [Riley defendants and the State] assert that ‘[i]f allowed to stand, the Order could provoke a conflict within the executive branch where there is currently none.’ Such a comment simply cannot be made with a straight face. A major reason why bingo has posed such an intractable problem in Alabama is the utterly dysfunctional relationship existing between the Governor and the Attorney General, as demonstrated by the Governor’s creation of the Task Force in the first place. This contention of the [Riley defendants and the State] is singularly unpersuasive.
“In their Motion, the [Riley defendants and the State] also reveal a misunderstanding of the March 8 order. For example, they state that ‘by directing the Governor and Attorney General to exercise their discretion at the Court’s bidding, the Court’s order violates the Alabama Constitution’s separation-of-powers principle.’ Similarly, the Motion states that ,‘[t]he Order also takes the unprecedented step of ordering the Attorney General to superintend a case he has decided not to superintend.’
“To be crystal clear, this Court does not intend to dictate to the Attorney General what action he must take. He may choose to take over representation of the [Riley defendants and the State], as he has the legal authority to do. He may expressly ratify the authority of the [Riley defendants’ and the State’s] counsel of record. He may abdicate his responsibility by electing not to take a *715 stand one way or another. It is up to the Attorney General to decide which course to take; all this Court has directed him to do is to tell us what his choice is. How this litigation unfolds will be based on his decision.
“Recognizing the significant issues presented by the March 8 order, this Court will nevertheless grant the Motion to Stay in part. The Attorney General remains under the obligation to advise the Court of his decision with respect to this litigation. Beyond that, however, further proceedings are stayed pending the Supreme Court’s adjudication of the pending mandamus petition.”[6]
On March 19, 2010, we granted the motion of the Riley defendants for an order staying the March 8 order, the March 16 order, and all proceedings in the actions at issue pending our decision on the petition filed by the Riley defendants and the State.
Attorney General King subsequently filed a motion with this Court in which he purports to appear “on behalf of the State and each State officer sued in his official capacity in the underlying litigation” and in which he requests dismissal of the mandamus petition based on “his authority outlined in Ex parte Weaver, 570 So.2d 675, 679-80 (Ala.1990).” Attorney General King further requests that “[sjhould this Court deem dismissal unavailable, ... this Court deny the [pjetition on the ground that the [State and the Riley defendants] have no clear legal right to the relief requested.”
On March 23, 2010, Cornerstone and FTV filed a “Motion to Dismiss Petition for Writ of Mandamus as Moot and Unripe, or, in the Alternative, to Stay Pending the Joinder of the Attorney General as a Necessary Party.” We denied the motion and ordered the parties to brief the issue whether the activities of the Task Force or its members are dependent upon prior approval of the Attorney General.
Also, Attorney General King filed a notice of appearance in the trial court and has thereby purported to “assume[] responsibility for representing the interests of the State of Alabama and the State officers sued' in their official capacities” in that court. Attorney General King sent letters directing District Attorney Tyson “to gather and turn over all of the evidence amassed by the Task Force [in-various counties] over the past fourteen months” and purporting to relieve District Attorney Tyson, Assistant District Attorney Tierney, Supernumerary District Attorney Greene, and Supernumerary District Attorney Morgan from any further involvement in the Task Force or in litigation associated with the Task Force. By letter of March 22, 2010, Attorney General King also “advised” Colonel Murphy (director of the Alabama Department of Public Safety) and'Administrator Folmar (Alcoholic Beverage Control Board), to “conduct no raids until further notice,” though he acknowledged that the agencies and officers of the Department and' the Board “answer to the Governor.” Attorney General King asserted to Colonel Murphy and Administrator Folmar that the State
*716 “will now adopt a different course to deal with determining the legality of electronic bingo in jurisdictions throughout Alabama. The approach we will take is the one I have recommended to Governor Riley on multiple occasions. This approach will involve civil declaratory judgment actions within the contested jurisdictions to seek a final definitive ruling from the Supreme Court of Alabama on whether any bingo occurring within the borders of that jurisdiction complies with Alabama’s Constitution and statutes.”
(Emphasis added.)
District Attorney Tyson responded by letter to Attorney General King’s directive. He informed Attorney General King that the evidence at issue was not in his possession, but in the possession of the Department of Public Safety and the Alcoholic Beverage Control Board, which were not under the authority of the Attorney General. See notes 1 and 2, supra. District Attorney Tyson further opined that handing over the evidence obtained by the Task Force so that Attorney General King could pursue civil proceedings would compromise the criminal investigation and prosecution. Also, District Attorney Tyson took the position that Attorney General King could not countermand the directives of Governor Riley as to the Task Force, and he refused to step down from the Task Force.
Likewise, Colonel Murphy and Administrator Folmar responded by letter to Attorney General King. They stated, in part:
“[0]ur agencies answer to the Governor, not the Attorney General. Consistent with that, the Attorney General of Alabama has no authority to impose a moratorium on the enforcement of Alabama’s criminal laws by the sworn law enforcement officers who work in our agencies. In fulfilling our oaths to uphold Alabama’s laws, we cannot and will not agree to pledge not to enforce the law, including Alabama’s laws against illegal slot-machine gambling. Any facility that engages in illegal sloLmachine gambling is subject to law enforcement, and those facilities should not expect our agencies to adhere to the ‘moratorium’ you suggest. No criminal is entitled to engage in criminal activity while a civil declaratory judgment proceeding winds its way through the courts.”[7]
*717 By letter dated April 7, 2010, Governor Riley also responded to Attorney General King’s attempt to relieve various members of the Task Force of their responsibility and to interfere with Governor Riley’s directives to the Task Force officers. The April 7, 2010, letter states, in part:
“Please be advised that in order to fulfill my duties under Article Y, Section 120 of the Alabama Constitution to ‘take care that the laws be faithfully executed,’ I am exercising the ‘supreme executive power’ granted me under Article V, Section 113, and the additional statutory and constitutional powers of my office, to overrule and nullify each of your purported directives to John Tyson, Martha Tierney, Ed Greene, Tim Morgan, Emory Folmar, and Colonel Chris Murphy, separately and severally.
“As head of the Executive Branch of which you are a part and pursuant to my constitutional and statutory authority as Governor, I am also directing you to withdraw and rescind your filings in the Circuit Court of Lowndes County and in the Supreme Court of Alabama in the Cornerstone Case No. 1090808. I am also directing you to provide any support and cooperation requested from you or your office by the Task Force on Illegal Gambling or its Special Prosecutors in connection with their efforts. I would further direct you to refrain from any effort to direct or interfere with the fulfillment of my Executive Order No. 44 (as amended) or the investigation or prosecution of any cases pursuant to that order.”
As a consequence of the foregoing, a standoff now exists between Governor Riley and Attorney General King concerning the control of the forfeiture proceeding and the control of the present petition.[8]

II. Issues-

As noted above, Supernumerary District Attorney Barber filed the forfeiture proceeding on behalf of the State; he has been replaced as commander of the Task Force by District Attorney Tyson, who is prosecuting that action. Supernumerary District Attorney Morgan signed the present petition for a writ of mandamus on behalf of the State; Morgan, District Attorney Tyson, and Assistant District Attorney Tierney are listed as counsel, and Governor Riley, through his personal counsel, Henry T. Reagan, is shown as joining in the petition. Attorney General King asserts that he has entered his appearance for the State; that he has authority to cause the dismissal of the petition; and that he is “invok[ing] that right;” As noted, Attorney General King has purported to relieve District Attorney Tyson, Assistant District Attorney Tierney, Supernumerary District Attorney Greene, and Supernumerary District Attorney Morgan
“of any responsibilities they may have had or believed they had to represent the State and State officers in the underlying actions and in this proceeding. To the extent that [Henry T.] Reagan has appeared on behalf of parties.other than the Governor, the Attorney General is hereby notifying him that he is re *718 lieved of representing any party other than the Governor.”
Attorney General King argues as follows in his motion to dismiss:
“The Attorney General’s appearance in the underlying actions has rendered moot all rulings in the March 8 Order except one: That supernumerary district attorneys and district attorneys designated to perform duties under Ala. Code §§ 12-17-216 and 12-17-184(10) ‘may perform such duties only subject to the direction and control of the Attorney General’ and are not able ‘to act beyond the Attorney General’s authority.’
“That ruling is consistent with and supported by existing Alabama authorities, including prior decisions of this Court. See Ala.Code § 36-15-21 (2001) (‘All litigation concerning the interest of the state, or any department of the state, shall be under the direction and control of the Attorney General.’); Ex parte Weaver, 570 So.2d 675, 679-80 (Ala.1990) (‘“[A]U litigation concerning the interest of the state or any department thereof [lies] under the direction and control of the attorney general.”’ Quoting State ex rel. Carmichael v. Jones, 252 Ala. 479, 484, 41 So.2d 280, 284 (Ala.1949).).
“More important, the ruling is not so clearly incorrect as to entitle [the State and the Riley defendants] to a writ of mandamus vacating it. See Ex parte Integon Corp., 672 So.2d 497, 499 (Ala.1995) (‘Mandamus is a drastic and extraordinary writ, to be issued only where there is ... a clear legal right in the petitioner to the order sought....’).
“Accordingly, if the Petition is not due to be dismissed under the Attorney General’s authority outlined in Weaver, it is due to be denied on the ground that [the State and the Riley defendants] lack a clear right to the relief requested.”
The issues before us are whether Attorney General King or District Attorney Andrews must approve the actions of the attorneys and other officers who have been authorized by Governor Riley to act, and whether, under the foregoing circumstances, the law authorizes Attorney General King to countermand Governor Riley’s exercise of authority to call upon -such persons to initiate and prosecute actions on behalf of the State.
In essence, Attorney General King’s argument is that the law governing the executive branch is .that the attorney general has absolute power over legal matters involving the interests of the State, including those that concern the limits, if any, of the attorney general’s power, and specifically those undertaken at the express direction of the governor. We reject this argument. We therefore also reject the assertion by Attorney General King that the issues raised by the trial court’s March 2010 orders are now moot.

III. Analysis

In the present case, we have the unusual circumstance of the governor of this State making a judgment that the laws concerning illegal gambling were not being enforced in certain counties in this State during the tenure of the current attorney general, that the lack of enforcement in these counties has “produced serious confusion about which activities are lawful and which are not,” and that the confusion is “being exploited by gambling promoters to expand and entrench illegal gambling activity in Alabama.” In an attempt to fulfill his charge to “take care that the laws be faithfully executed,” therefore, Governor Riley has directed certain law-enforcement officers who have been placed at his disposal by law to investigate and prosecute alleged gambling activity.
*719 With this in mind, we turn now to an examination of the relevant constitutional and statutory provisions.
Article V of the Alabama Constitution of 1901 creates and defines the “executive department” of government. Section 112 of that article provides: “The executive department shall consist of a governor, lieutenant governor, attorney-general, state auditor, secretary of state, state treasurer, superintendent of education, commissioner of agriculture and industries, and a sheriff for each county.” The very next provision of that article states as follows: “The supreme executive power of this state shall be vested in a chief magistrate, who shall be styled ‘The Governor of the State of Alabama.’” Ala. Const.1901, § 113 (emphasis added). Section 120 of that article then provides that “[t]he governor shall take care that the laws be faithfully executed.” Ala. Const.1901, § 120 (emphasis added). As hereinafter discussed, these express constitutional provisions, all of which are of course unique to the office of governor, plainly vest the governor with an authority to act on behalf of the State and to ensure “that the laws [are] faithfully executed” that is “supreme” to the “duties” given the other executive-branch officials created by the same constitution. See generally Black’s Law Dictionary 970 (8th ed. 2004) (defining a “magistrate” as “[t]he highest-ranking official in a government, such as the king in a monarchy, the president in a republic, or the governor in a state. — Also termed chief magistrate; first magistrate”). See also Opinion of the Justices No. 179, 275 Ala. 547, 549, 156 So.2d 639, 641 (1963): “The laws of the state contemplate domestic peace. To breach that peace is to breach the law, and execution of the laws demands that peace be preserved. The governor is charged with the duty of taking care that the laws be executed and, as a necessary consequence, of taking care that the peace be preserved;” -
The authority of the governor relative to the other executive offices created by Article V is further corroborated by other express provisions of that article. Section 121 of Article V provides:
“The governor may require information in writing, under oath, from the officers of the executive department, named in this article, or created by statute, on any subject, relating to the duties of their respective offices, and he may at any time require information in writing, under oath, from all officers and managers of state institutions, upon any subject relating to the condition, management and expenses of their respective offices and institutions. Any such officer or manager who makes a willfully false report or fails without sufficient excuse to make the required report on demand,- is guilty of an impeachable offense.”
Commenting on comparable provisions in that state’s constitution, the Supreme Court of Maine explained:
“The Governor of the State under our Constitution has the power to require information from any officer in the executive department. He has the duty to ‘take care that the laws be faithfully executed. ’ He is the head of the executive department. To carry out these great constitutional powers, in our view, everything pertaining to the executive department is at all times pending before the Governor in his official capacity.”
State v. Simon, 149 Me. 256, 263-64, 99 A.2d 922, 925 (1953) (emphasis added).
Moreover, § 131 of Article V provides as follows:
“The governor shall be commander-in-chief of the militia and volunteer forces of this state, except when they shall be *720 called into the service of the United States, and he may call out the same to execute the laws, suppress insurrection, and repel invasion, but need not command in person unless directed to do so by resolution of the legislature.”
Commenting on § 131, this Court stated in Opinion of the Justices No. 179, 275 Ala. at 550, 156 So.2d at 642: “[T]he architects of our Constitution provided that the governor may call out those forces to execute the laws and suppress insurrection. If the governor may employ the military forces, certainly he may employ the civil forces to keep the peace.” This Court also has stated that “[i]t is the governor whom the people have charged to ‘take care that the laws be faithfully executed.’ Ala. Const. 1901, § 120.... ‘[T]he core power of the executive branch’ is the enforcement of those laws. Opinion of the Justices No. 380, 892 So.2d 332, 335 (Ala.2004).” McInnish v. Riley, 925 So.2d 174, 179 (Ala.2005) (emphasis omitted).
The Supreme Court of Kansas put it well we think when it considered similar provisions of that state’s constitution:
“We do not find that the meaning of the phrase, ‘the supreme executive power’ as contained in our Constitution and the Constitutions of many other states of this Union, has ever been precisely defined, although the matter is referred to in some decisions. Perhaps the tern itself, taken in connection with the context, is sufficiently explicit. An executive department is created, consisting of a Governor and the other officers named, and he is designated as the one having the supreme executive power; that is the highest in authority in that department. In the same connection, it will be noticed that the other executive officers are required to furnish information upon subjects relating to their duties, and to make annual reports to him, and withal he is charged with the duty of seeing that the laws are faithfully executed. It is manifest from these various provisions that the term ‘supreme executive poiver’ is something more than a verbal adornment of the office, and implies such power as will secure an efficient execution of the laws, which is the peculiar province of that department, to be accomplished, however, in the manner and by the methods and within the limitations prescribed by the Constitution and statutes, enacted in harmony with that instrument. “When a Constitution gives a general power or enjoins a duty, it also gives by implication, every particular power necessary for the exercise of the one or the performance of the other.’ ”
State ex rel. Stubbs v. Dawson, 86 Kan. 180, 187-88, 119 P. 360, 363 (1911) (emphasis added; citation omitted).
In a case that addressed the employment of that state’s militia by the governor, rather than the mere deployment of prosecutorial resources, the Supreme Court of Mississippi considered the meaning of language similar to that in our constitution:
“Section 123, Constitution 1890, provides that ‘The governor shall see that the laws are faithfully executed.’...
[[Image here]]
“The constitutional and statutory provisions requiring the Governor to see that the laws are executed have no obscure or technical meaning; neither were they intended as a mere verbal adornment of his office. State v. Dawson, 86 Kan. 180, 187, 119 P. 360, 39 L.R.A., N.S., 993 [ (1911) ]. They mean what is in the ordinary import of the language used, to wit, that the laws shall be carried into effect, that they shall be enforced. And when this language is taken in connection with section *721 9 of the Constitution, it means, of course, as was said in Henry v. State, 87 Miss. 1, 38, 39 So. 856 [ (1906) ], not that, there shall be, an arbitrary enforcement by the executive of what he may consider the law to be, but the enforcement of judicial process that is, the enforcement of a right or remedy provided by the law and judicially determined and ordered to be enforced, and it includes criminal as well as civil process; and the term ‘process’ is used here in its broadest sense, so long as it is a judicial process. All these provisions, when taken together, mean that whatever the Governor does in the execution of the laws, or whatever members of the militia do, under such authority, must be as civil officers, and in strict subordination to the general law of the land.
“A permeating feature in our State Constitution, and in all State Constitutions, is that primary local authority shall be preserved, so far as practically possible. The execution of civil and criminal process — the execution of the laws — was and is no exception to this structural rule. It was foreseen, however, by the framers of the Constitution that for one cause or another, local conditions would sometimes arise which would render the local authorities powerless to enforce the laws, or unwilling or afraid to do so. It was to meet such conditions, as one of its purposes, that the constitutional and statutory authority which we have above mentioned in respect to the execution of the laws was vested in the Governor. The Constitution makers did not leave any such loophole as to permit statutes enacted for general observance throughout the state to be set aside, or in practical effect repealed, in any particular section or area by the device of a failure or refusal of the local authorities to enforce such statutes.
“Thus and for the Stated reason, the chief executive was given the authority and it was made his duty to act to enforce the laws, duly and constitutionally enacted, in every portion of the state, so that eveny citizen and, all property would have the protection of the laios and, that every criminal statute should be observed,. Thus the poiver to enforce the laws is not left as a matter of finality to the discretion of the local authorities or the local inhabitants; but poiver was placed in the head, of the executive department to act, in case of need,, for the whole state. The Governor is an executive officer in every county of the state; and he may set the enforcement machinery in motion and, thereby determine to whom the civil process may be directed for execution, when that has become proper on account of failure, neglect, or inability of the local executive officers to act. Every power at his command given by the Constitution and statutes may be brought into play so far as needed, to effect the enforcement of the kiio. ...
“As was said by the court in Franks v. Smith, 142 Ky. 232, 134 S.W. 484, L.R.A. 1915A, 1141, Ann.Cas. 1912D, 319 [ (1911) ]: ‘Primarily, the enforcement of the law is with the local civil authorities, but at times they are too weak to control the lawless elements that exist in every society, and at other times they might be in sympathy with the forces who ivant to take the law into their own hands. But, whatever the reason that may exist for the failure or inability of the local civil authorities to suppress violence and disorder, when it comes to pass that they cannot or ivill not do it, then it is not only the right but the plain duty of the Governor to act. Ours is a government of law. Under its authority and through its agencies alone *722 wrongs must be redressed and rights protected. Unless this were so, there would be no assurances of peace or quiet for the law-abiding and order-loving, who constitute so large a part of our people. The life and property of the citizen would be insecure, and the lawless, reckless, and violent would be at liberty to exercise at will their disregard of civil authority.’ It will be noted that the above language was addressed to occasions of violence and disorder, but it applies as well to situations where there is a breakdown of the enforcement of the laws, although not attended by nature actual violence, or disorder of a violent nature.
[[Image here]]
“A fair measure of deference must be accorded to the local authorities, but when, as here, the Governor has sought by representations to, and requests of, the local authorities that the law be enforced, and they fail to do so; when their failure becomes tantamount in substantial results to a refusal, or to no more than a futile pretense; when the condition exists and persists for that length of time which makes it clearly apparent that no dependence is to be placed upon the local executive officers and that they either cannot or will not enforce the laws, so that as respects all offenses of a certain class or classes, or as to any class or classes of civil process, there has been a substantial breakdown of local enforcement, then the power and duty of the Governor arises to send the executive agents with which the law has armed him, to wit, the militia, not at all to supersede the law, but to enforce it, the members of the militia to perform the duties which the local executive officers would and could perform were they immediately present and were they performing their duties as they ought to do and ought to have done.”
State v. McPhail, 182 Miss. 360, 374, 180 So. 387, 389-91 (1938).
Based on the foregoing, we reach two preliminary conclusions. First, if our constitution’s grant of “supreme executive authority” to the governor and its charge that the governor “take care that the laws be faithfully executed” mean anything in relation to a matter for which another constitutional officer is also given responsibility, they at least mean as follows: when the governor determines that, whether due to inaction or inadequate action by the other official, it is necessary for him to act lest the law go unenforced, he may act.[9]
Second, the aforesaid authority to act derives from the constitution itself, not from any statutory grant of authority by the legislature. That is, it is authority that exists even in the absence of a specific grant of authority by the legislature. In Opinion of the Justices No. 179, this Court stated:
“So far as we are advised, however, no legislative act places in the governor power to open or close schools. Consequently, we are of opinion that he has no power to open or close schools.
“This is not to be understood as a restriction on the governor’s power to keep the peace. That he must strive to do. If closing of the schools be the actual and incidental result of keeping the peace, the power to keep the peace is not restñcted.”
*723 275 Ala. at 550, 156 So.2d at 642-43 (emphasis added). Again, “ ‘[w]hen a Constitution gives a general power, or enjoins a duty, it also gives, by implication, every particular power necessary for the exercise of the one, or the performance of the other.’ ” Dawson, 86 Kan. at 188, 119 P. at 363 (quoting Field v. People, 3 Ill. (2 Scam.) 79, 83 (1839)).[10]
In this instance, however, it is not necessary to rely solely upon the authority implied from the express provisions of the constitution. Numerous statutory provisions and decisions of this Court authorize the governor to bring suit in the name of the State.
It is not surprising, for example, given the governor’s position as “chief magistrate,” that Alabama law recognizes the governor’s power to direct the filing of civil actions on behalf of the State. See Ala. Code 1975, § 6-5-l(b) (“The district attorney of the circuit in which an action by the state is pending must attend to the same on the part of the state, and the Governor of the state may employ assistant counsel if he deems it necessary. The written direction of the Governor to the attorney of record is sufficient authority for commencing such an action, and the trial judge may determine the amount of compensation.”); State v. Stacks, 264 Ala. 510, 514, 88 So.2d 696, 699 (1956) (“We are ... constrained to hold that the Attorney General must file the suits in question under [the predecessor statutes to § 6-5-1 and § 6-5-4, Ala.Code 1975,] when directed by the Governor to do so.”); see also, e.g., *724 State ex reí. Haskell v. Huston, 21 Okla. 782, 97 P. 982 (1908) (“The right of the Governor to bring suit in the name of the state, in matters publici juris, has been conceded by the courts of last resort throughout this Union ever since the early days of this republic.” 21 Okla. at 784, 97 P. at 983. “14 Ency. of Law (2d Ed.) 1100, lays down the general rule: ‘The Governor, as special guardian of the state’s rights, is the proper party to initiate necessary litigation. His right to do so is indeed a part of his general power of supervision over the property and welfare of the state.’” 21 Okla. at.787, 97 P. at 984. “The right of the Governor to bring suit in the name of the state, in all matters publici juris, is placed upon the high ground of his duty, under the Constitution of the state, to cause the laws to be faithfully executed, and not upon any statutory ground.” 21 Okla. at 790, 97 P. at 985.). See also Ala.Code 1975, § 6-5-2 (providing that the governor may direct that actions be commenced in the name of the State in foreign jurisdictions and he may employ counsel for the same); Ala.Code 1975, § 6-5^4 (providing that the governor may “cause actions to be commenced” to recover property of the State that is lost by neglect or default, wrongfully disbursed, or wrongfully used by a public officer and to employ counsel for the same).
We also 'note a number of statutes that expressly give the governor the authority to direct the attorney general in certain litigation matters. See Ala.Code 1975, § 36-11-4 (the governor can “direct” the attorney general to file impeachment proceedings against constitutional officers, and he can direct the district attorney to file impeachment proceedings against county or municipal officers); Ala.Code 1975, § 15-22-20(e) (the governor can “direct” the attorney general to institute an inquisition proceeding as to a member of the Board of Pardons and Paroles); Ala. Code 1975, § 40-12-269(c) (the governor can “direct” the attorney general to file impeachment proceedings against a probate judge); Ala.Code 1975, § 41-15B-2© (“Any conflicting prior law notwithstanding, the Governor, or the Attorney General with the consent of the Governor, shall file any litigation necessary to effectuate the compelling interest of the State of Alabama to recover tobacco-related damages incurred by the state or pursue any other legal cause of action in which the state has an -interest. The Governor may institute or participate in any civil litigation in which the state has an interest. When initiated by the Governor, such litigation shall be brought in the name of the Governor acting in his official capacity; when the Governor intervenes in existing litigation, he shall do so in the name of the Governor, also acting in his official capacity. In the unlikely event that the Attorney General fails or refuses to bring litigation requested by the Governor, the Governor may bring such litigation ‘on relation of the state and shall appoint counsel for such litigation.”)[11]
*725 More specifically for purposes of the present case, Ala.Code 1975, § 12-17-184(10), provides:
“It is the duty of every district attorney and assistant district attorney, within the circuit, county, or other territory for which he or she is elected or appointed:
[[Image here]]
“(10) To go to any place in the State of Alabama and prosecute any case or cases, or work with any grand jury, when called, upon to do so by the Attorney General or the Governor of the State of Alabama, and to attend sessions of courts and transact all of the duties of the district attorney in the courts whenever called upon by 'the Attorney General or the Governor to do so.”
(Emphasis added.)
Likewise, § 12-17-216, Ala.Code 1975, specifically provides:
“Supernumerary district attorneys ... shall have and exercise all the duties, power and authority of district attorneys of the judicial circuits or circuit courts and shall, upon request of the Governor, the Chief Justice of the Supreme Court or the Attorney General, conduct investigations, attend any ... session of any circuit court in any of the judicial circuits of Alabama for the investigation of or the prosecution of any criminal case or the prosecution or defense of any case in which the state is interested. The Governor, any member of the Supreme Court or courts of appeals or the Attorney General may request a supernumerary district attorney to perform duties as those prescribed for assistant attorneys general, either in them respective offices or at such other places within or without the state as such officials may assign him. When on such special assignment at the request or designation of one, of the aforementioned officials and performing duties as those prescribed for assistant attorneys general the supernumerary district attorney shall have all the powers and authority of an assistant attorney general and shall be entitled to the same amount of sick leave and annual leave that accrues to an assistant attorney general; and, while performing such duties at the request of the Attorney General, he shall be designated as a special assistant .attorney general.”
(Emphasis added.).
Further, Ala.Code 1975, §■ 36-13-2; states that
“[wjhenever, in his judgment, it is expedient or necessary, the Governor may employ an attorney or attorneys to advise him in his official capacity, or to institute, conduct or appear in any court or in any civil or criminal case in which the state is interested and to agree with such counsel on his compensation .... The compensation of such counsel shall be paid ... out of such funds as are appropriated to the Governor’s office.”
See State ex rel. Troy v. Smith, 187 Ala. 411, 416, 65 So. 942, 943 (1914) (“It is thus seen that by [the language used in what is now § 36-13-2 that], the Governor is empowered to employ ... an attorney or *726 attorneys to advise him in his official capacity, as well as to institute, conduct, or appear in any civil or criminal case in which the state is interested, in any court.” (emphasis added)).[12]
On their face, §§ 12-17-184(10) and -216, if not also § 36-13-2, authorize the governor to act as Governor Riley has in this case. Moreover, all statutes concerning the rights and powers of the governor must be read in the context provided by §§ 113 and 120 of the constitution. See City of Birmingham v. Emond, 229 Ala. 346, 349, 157 So. 64, 66 (1934) (applicable statutes considered in pari materia with pertinent constitutional provisions). Under the constitution, it is the governor who is the “chief magistrate” with “the supreme executive power” to “take care that the laws be faithfully executed.” The legislature has expressly provided that the governor can direct a district attorney or a supernumerary district attorney to represent the interests of the State in the trial court and in this Court, as applicable.
The trial court here and Attorney General King, as well as District Attorney Andrews, contend that constitutional authority is held by the attorney general that impinges upon the governor’s ability to act as aforesaid. In this regard, however, we first note that, in contrast to the governor, the attorney general has no direct and express power under the constitution.
Nonetheless, Attorney General King asserts that his status as an independently elected executive officer requires us to conclude that he has the right to take over the prosecution at issue and to dismiss the petition to this Court filed by the State and the Riley defendants. As Attorney General King, Cornerstone, and FTV note, the attorney general is indeed an independently elected executive officer, Ala. Const.1901, § 114 (OffRecomp.), and the delegates to the 1901 Constitutional Convention expressly rejected a proposed amendment that would have allowed the governor to appoint the attorney general. Official Proceedings of the Constitutional Convention of the State of Alabama, Vol. 1, at 220, 506-10 (June 11, 1901). In so doing, however, the delegates did not make the governor subservient to the attorney general, and they did not authorize the attorney general to prevent the governor from exercising or fulfilling the authority and obligations given by the constitution or otherwise by law. To conclude otherwise necessarily would mean that the delegates created a second executive officer who has supreme executive power within some sphere assigned to him and that the governor is only the supreme executive with respect to matters in some different sphere. Obviously nothing in the text of the constitution supports such a notion, and such a notion is plainly contrary to the position of the governor expressed in §§ 113 and 120 of the constitution.
Unlike the provisions of the constitution that single out the governor and expressly and directly vest him with the “supreme executive power” and, as a corollary, authorize him to “take care that the laws be faithfully executed,” § 137 of the constitution addresses the duties of all the other executive branch officials created by the *727 constitution as a group. Further, it merely delegates to the legislature the authority to prescribe “duties” for all these officers:
“The attorney general, state auditor, secretary of state, state treasurer, and commissioner of agriculture and industries shall perform such duties as may be prescribed by law .... The legislature may require the attorney general to defend any or all suits brought against the state, or any subdivision thereof, or against any state school board or state board of education, or against any county or city school board or board of education, or against like boards or commissions by whatever name designated, or against any members, officers or employees of any such boards, or against any school official or employee throughout Alabama.”
Ala. Const.1901, § 137 (Off.Recomp.)(em-phasis added).
Although there is no express mention of common-law powers in the constitution, in Ex parte Weaver, 570 So.2d 675 (Ala.1990), this Court concluded that the language in the first sentence of § 137 granted the attorney general the powers that were held by the attorney general at common law. 570 So.2d at 684. In a well reasoned dissenting opinion, Justice Houston questioned whether the conclusion of the main opinion was correct. 570 So.2d at 688 (Houston, J., dissenting).[13]
*728 Nevertheless, the year after the Court released its decision in Ex parte Weaver the legislature enacted Ala.Code 1975, § 36-15-1.1, which states:
“The Attorney General shall have and retain all of the powers, duties, and authority heretofore granted or authorized by the constitution, statutory law, or the common law.
“Nothing contained in this article shall be construed so as to in any way restrict, limit or abridge the powers, duties, or authority of the Attorney General as heretofore authorized by the constitution, statutory law, or the common law.”
Thus, at a minimum, the attorney general now possesses common-law powers because they have been prescribed for him by the legislature pursuant to its authority to do so under § 137.
Such common-law powers of the attorney general do not conflict with the supreme executive power of the governor, however. As the Weaver Court itself recognized, at common law the attorney general was “ ‘the sovereign’s primary legal representative, with considerable power subject to limitation only by the King, ’ ” i.e., the chief magistrate. 570 So.2d at 677 (quoting Note, Tice v. Department of Transportation: A Declining Role for the Attorney General? 63 N.C.L.R. 1051, 1053 (1985)) (emphasis added). See also VI William Holdsworth, A History of English Law 466-67 (2d ed. 1937)(explaining that, as chief legal representative of the king, the common-law attorney general was subject to the wishes of the crown); *729 Black’s Law Dictionary 872 (6th ed. 1990) (defining a “king” as “[t]he sovereign, ruler, or chief magistrate of a state or nation whose constitution is of the kind called ‘monarchical.’ ... The word expresses the idea of one who rules singly over a whole people or has the highest executive power; but ... the sovereignty of the king may or may not be absolute, according to the constitution of the country.”). Although we recognize that the governor obviously is not a king and thus does not have the power to appoint and remove the attorney general (or any other constitutional officer) at his pleasure, by constitutional designation he is the “chief magistrate” of the State of Alabama.
In the present case, Governor Riley concluded that the criminal law of Alabama regarding gambling devices and gambling enterprises had gone unenforced in certain counties and that, without action on his part and on the part of those he authorized to act, that law would continue to go unenforced in those counties during Attorney General King’s tenure. He employed certain officers placed at his disposal to enforce those laws with respect to machines and operations against which those statutes clearly were not being enforced, either by Attorney General King or by local law enforcement (including, in the case of the EC, District Attorney Andrews).
Attorney General King now claims a “common-law” procedural prerogative to control the litigation initiated and authorized by Governor Riley based on his determination that there was a lack of enforcement of the laws on Attorney General King’s watch. Now, after the trial court has entered an order concluding that the forfeiture proceeding cannot proceed absent affirmative approval by Attorney General Kiug and/or District Attorney Andrews (indeed, that the seizure of the machines and the filing of the forfeiture proceeding are “nullities” for lack of advance approval by Attorney General King), Attorney General King has attempted to take over the litigation, to dismiss the Task Force members who are prosecuting the litigation, and to abandon .the State and the Riley defendants’ argument questioning the trial court’s conclusion as to the requirement that Attorney General King be involved; a conclusion that, if correct, calls into question the validity of every action that is being prosecuted and has been prosecuted by the Task Force and its members. Under such circumstances, Governor Riley’s express constitutional and statutory power is clearly what is at issue. We conclude that the common-law powers that have been “prescribed” to the attorney general do not include the right to ■ countermand the “chief magistrate” where the chief magistrate is acting within the bounds of the power given to him.[14]
Attorney General King also relies upon a number of statutes by which he claims *730 authority to countermand the action of Governor Riley and the attorneys Governor Riley has authorized to act. We first note that we do not view these statutes on their face in the same manner as does Attorney General King.
Attorney General King points us to § 36-15-1, Ala.Code 1975, which states:
“The Attorney General shall keep his or her office at the capital city and perform the following duties:
[[Image here]]
“(2) He or she shall attend, on the part of the state, to all criminal cases pending in the Supreme Court or Court of Criminal Appeals, and to all civil actions in which the state is a party in the Supreme Court or Court of Civil Appeals. He or she shall also attend to all cases other than criminal that may be pending in the courts of this state, in which the state may be in any manner concerned, and shall appear in the courts of other states or of the United States, in any case in which the state may be interested in the result.
[[Image here]]
“The duties imposed by this section upon the Attorney General and his or her assistants shall be performed by the attorney general personally or by his or her assistants under his or her supervision, direction, and control.
“Any statute to the contrary notwithstanding, no attorney shall represent the State of Alabama, or any agency, department, or instrumentality of the state in any litigation in any court or tribunal unless the attorney has been appointed as a deputy attorney general or assistant attorney general.”
Clearly the middle two of the above-quoted paragraphs do not require the con-elusion urged by Attorney General King. Those provisions merely describe “duties” the legislature has “prescribed” to the attorney general in keeping with § 137 of the constitution. They contain no express provision purporting to limit the power and rights of the governor. The same can be said of the provisions of other statutes urged in support of Attorney General King’s position, namely Ala. Code 1975, § 36-15-12 (“The Attorney General is authorized to institute and prosecute, in the name of the state, all civil actions and other proceedings necessary to protect the rights and interests of the state.”); Ala. Code 1975, § 36-15-14 (“The Attorney General, either in person or by one of his assistants, may at any time he sees proper, either before or after indictment, superintend and direct the prosecution of any criminal case in any of the courts of this state. The district attorney prosecuting in such court shall assist and act in connection with the Attorney General or his assistant in such case.”); and Ala.Code § 36-15-15 (“The Attorney General shall give the district attorneys of the several circuits any opinion, instruction or advice necessary or proper to aid them in the proper discharge of their duties, either by circular or personal letter, and may direct any district attorney to aid and assist in the investigation or prosecution of any case in which the state is interested, in any other circuit than that of the district attorney so directed. Such district attorney shall have and exercise in such other circuit all the powers and authority imposed by law upon the district attorney of such other circuit, but this section shall not abridge any authority which may have been or which may be vested in the Chief Justice of the Supreme Court....”[15]).
*731 As for the last quoted paragraph of § 36-15-1, we again note that under § 12-17-216
“[t]he Governor, any member of the Supreme Court or courts of appeals or the Attorney General may request a supernumerary district attorney to perform duties as those prescribed for assistant attorneys general, either in their respective offices or at such other places within or without the state as such officials may assign him. When on such special assignment at the request or designation of one of the aforementioned officials and performing duties as those prescribed for assistant attorneys general, the supernumerary district attorney shall have all the powers and authority of an assistant attorney general and shall be entitled to the same amount of sick leave and annual leave that accrues to an assistant attorney general; and, while performing such duties at the request of the Attorney General, he shall be designated as a special assistant attorney general.”
The import of the above-emphasized passages is self-evident.[16] Thus, even assuming that the last paragraph of § 36-15-1 was deemed to be otherwise restrictive of the governor’s authority, the governor can still utilize, as he has, the services of Supernumerary District Attorneys Morgan and Greene without violating that provision. For the other reasons hereinafter discussed, however, we disagree with the reading of the last paragraph of § 36-15-1 as otherwise restrictive of the governor’s authority.
We note that, just as those statutes detailing specific authority to the governor have been enacted by the legislature in the context of § 113 and § 120, Ala. Const. 1901, so has § 36-15-1 been enacted in the context of § 137, Ala. Const.1901. Just as we see nothing on the face of § 137 that contemplates any limit on the express constitutional grant of authority and power to the governor in earlier provisions of the constitution, we do not see on the face of the last paragraph of § 36-15-1 an express attempt to limit other persons, particularly the governor, from representing the interests of the State. Properly read in the context of the aforesaid constitutional provisions and the balance of the statute itself, the last paragraph of § 36-15-1 refers to an affirmative duty given the attorney general to ensure that counsel he uses to represent the interests of the State are properly authorized to act. It is included in a statute concerning the duties of the attorney general. In addition, to read the last paragraph of § 36-15-1 as suggested by Attorney General King would mean that not even a district attorney ■ could appear in a trial court.on behalf of the State unless he or she also was appointed as a deputy attorney general or an assistant attorney general. This would lead to the conclusion that the legislature intended the language at issue to abrogate not only the statutes in favor of the power of the governor under § 12-17-184(10), § 12-17-216, and § 36-13-2, but also those in favor of the power of the district attorneys throughout the state, e.g., § 12-17-184. See Walker County v. White, 248 Ala. 53, 55, 26 So.2d-253, 255 (1946) (recognizing that statutes should be construed to avoid conflict and to form a harmonious whole).
To a large degree, the same observations apply to Ala.Code 1975, § 36-15-21, Ala.Code 1975, which states:
*732 “All litigation concerning the interest of the state, or any department of the state, shall be under the direction and control of the Attorney General. The employment of an assistant attorney general, other than an assistant attorney general employed in the office of the Attorney General, for the purpose of representing the state or any department thereof shall be by the Attorney General with the approval of the Governor, but nothing in this section shall prevent the Governor from employing personal counsel, whose compensation shall be payable out of the Governor’s Contingency Fund.”
We also note that the tension between the powers of the governor and the statutory authority of the attorney general to prosecute “all” cases finds an analogue in the juxtaposition of authority granted the attorney general and that granted district attorneys. Thus, in Graddick v. Galanos, 379 So.2d 592, 594 (Ala.1980), this Court found no conflict between the attorney general’s authority in § 36-15-14 to superintend criminal cases, on the one hand, and “the duty of every district attorney and assistant district attorney, within the circuit, county, or other territory for which he is elected or appointed: ... (2) to draw up all indictments and to prosecute all indictable offenses.” § 12-17-184(2) (emphasis added). This Court reasoned that the latter language merely describes the powers of the district attorney and is not a limitation on the powers of the attorney general.
In other contexts this Court has expressly rejected .the argument that § 36-15-21 means “only the Attorney General can litigate the interests of the State and its various departments.” Britnell v. Alabama State Bd. of Educ., 374 So.2d 282, 285 (Ala.1979) (taxpayer standing); see also Zeigler v. Baker, 344 So.2d 761, 764 (Ala.1977) (noting that one of the bases for a taxpayer’s standing to file a petition attacking an allegedly wrongful government expenditure is that the attorney general has not filed such a petition).
More generally, we conclude for two reasons that the statutes relied upon by the Attorney General serve neither to invalidate the Governor’s actions and the continued actions of those whom he has employed nor to authorize the Attorney General to countermand those actions. First, the statutes concerning the governor’s right to direct the institution and prosecution of litigation on behalf of the State through district attorneys and supernumerary district attorneys, i.e., § 12-17-184(10) and § 12-17-216, are specific to the situation in which the governor perceives the need to call upon such persons to pursue one or more particular matters. These statutes contemplate that when the governor has exercised his power in such a situation, the district attorney or supernumerary district attorney he has called upon will prosecute the matter as requested by the governor. In contrast, the last paragraph of § 36-15-1 and § 36-15-21 reflect general rules. We cannot conclude that what the legislature specifically intended to provide the governor on the one hand, it intended to authorize the attorney general to withdraw from him on the other hand through the general provisions of § 36-15-1 and § 36-15-21.[17] See, e.g., Ex parte E.J.M., 829 So.2d 105, 108-09 (Ala. 2001) (“ ‘Our cases, without conflict, give emphasis to the well defined rule that *733 “ ‘ “special provisions relating to specific subjects control general provisions relating to general subjects” ’ and “ ‘ “when the law descends to particulars, such more special provisions must be understood as exceptions to any general rules laid down to the contrary.” ”” ” (quoting Geter v. United States Steel Corp., 264 Ala. 94, 97, 84 So.2d 770, 773 (1956), quoting in turn other cases)); Crawford v. Springle, 631 So.2d 880, 882 (Ala.1993) (“Where statutes in pari materia are general and specific, the more specific statute controls the more general statute.”).
Second, the numerous statutes prescribing the authority and duties of the governor and the attorney general as herein-above discussed must be read in pan materia with one another and, a fortiori, with the governing constitutional provisions. It is clear from a comparison of the constitutional and statutory provisions concerning the governor and those concerning the attorney general that the governor is the superior officer. Generally, where the governor is authorized to act he is not subject to. any other executive officer. Further, provisions such as the last paragraph of § 36-15-1 and § 36-15-21 obviously contemplate those suits or appeals in which the State or some department or official thereof is in need of representation, and it is not surprising that the legislature would assign those duties to the attorney general. So understood, the statutes obviously have a very large field of operation. It is not necessary to construe them as being in conflict with those constitutional and statutory provisions giving the governor the supreme executive authority and authorizing him to retain counsel and call upon district attorneys and supernumerary district attorneys, see, e.g., Decatur Lab., Inc. v. Sizemore, 564 So.2d 976, 977 (Ala.Civ.App.1990) (“It is well settled that, where possible, statutes should be construed to be constitutional”). Were we required to do so, any such conflict would have to be decided in favor of the governor and the constitution’s direct and explicit grant to him of the supreme executive power.
Even' if we could conclude that the “scale” otherwise tilted in favor of the Attorney General’s view of the foregoing statutes, we could not act on that conclusion here. The Governor has determined that action on his part is necessary to take care that the laws are faithfully executed. If the governor’s “supreme executive power” means anything, it means that when the governor makes a determination that the laws are not being faithfully executed, he can act using the legal means that are at his disposal.[18]
Attorney General King, Cornerstone, and FTV argue, however, that for this Court to agree with Governor Riley’s position would be to make “absolute” — as against other constitutional officers — his discretion to perform tasks-in areas for which such officers have responsibility. Unlike the federal government, Alabama *734 does not have a unitary executive branch. Instead, the Alabama Constitution of 1901 creates an executive branch that includes several independently elected executive officers. In providing for those officers other than the governor, the constitution means more than just that these are to be officials elected directly by the people of Alabama, rather than appointed by the governor. Section 137 obviously contemplates that the officers other than the governor are each to have their own spheres of authorities and duties. In this vein, Cornerstone and FTV assert:
“If the Governor’s position is correct, then there would be no need to elect any other executive officers, as each would be subject to the Governor’s veto. Instead, the Governor alone should be elected and then allowed to appoint a group of lemmings to follow wherever he leads.”
This argument is without merit. First, it fails to apprehend the fact that the Governor is acting here pursuant to specific grants of authority by the legislature. More fundamentally, the above-quoted argument does not correctly reflect the constitutional juxtaposition of the other executive officers in relation to the governor in the absence of express statutory authority so construed.
Addressing the respondents’ concern more specifically in the context of the present case, it is true that the Governor’s argument in this case contains no suggestion of a bad-faith or other limitation on his authority to decide that the law is going unenforced in an area for which another executive officer has responsibility. To decide this dispute between two constitutional officers over their respective spheres of authority, however, it is not necessary for us to decide whether the governor’s discretion to make such a decision and act upon it is indeed “absolute” in relation to the other official, the concern expressed by the respondents. We are clear to the conclusion that, at least under circumstances such as those presented here, Governor Riley acted consistently with his constitutional authority.
The Governor has taken the position that the term “bingo” in the local amendments is a reference to the game traditionally known as bingo, i.e., a game that is not played by or within the electronic or computerized circuitry of a machine, but one that is played on physical cards (typically made of cardboard or paper) and that requires meaningful interaction between those who are playing and someone responsible for calling out the randomly drawn designations corresponding to designations on the players’ cards. There is no meaningful dispute that the machines and operations at issue here do not fall within that description. Further, the Governor’s position that the term bingo is a reference to the game traditionally known as bingo is consistent with at least three Alabama appellate decisions. See City of Piedmont v. Evans, 642 So.2d 435, 436 (Ala.1994); Foster v. State, 705 So.2d 534, 537-38 (Ala.Crim.App.1997) (treating the mere term “bingo” in a local constitutional amendment that uses the term the same way as do the amendments at issue here as simply a reference to the “ordinary game of bingo”); Barrett v. State, 705 So.2d 529, 531-32 (Ala.Crim.App.1996) (to like effect).
It also is undisputed that for a substantial period before the creation of the Task Force in the spring of 2009 and the appointment at that time of Barber under § 12-17-216, neither Attorney General King nor District Attorney Andrews were engaged in any effort to enforce against the machines and operations in question the criminal statutes of this State prohibiting gambling devices and slot ma *735 chines.[19] The briefs and other materials before us indicate likewise that, since the creation of the Task Force and Governor Riley’s request that Barber undertake certain duties pursuant to § 12-17-216, Attorney General King has hot attempted to enforce those statutes against the machines and operations . in question. Nor does it appear that Attorney General King has attempted to pursue the “different course” of civil declaratory-judgment actions he proposed in his letter to Colonel Murphy and Administrator Folmar. Even if Attorney General King were now to take action of either nature, it would come too late. We are unwilling to conclude that Governor Riley cannot, without exceeding any discretion on his part, insist that that which he found it necessary to initiate with the appointment of Barber, Tyson, Tier-ney, Morgan, and Greene continue to its conclusion under the direction of those officials, rather than by Attorney General King, if it is to serve the stated purpose of ensuring the faithful execution of the laws.[20]
In this regard, we also take cognizance of the number of cases, including, but not limited to this one, that have been appealed to this Court during the course of the last year and that concern disputes over the necessity for law-enforcement action with respect to so-called electronic or computerized “bingo” machines and related operations. See, e.g., Etowah Baptist Ass’n v. Entrekin, 45 So.3d 1266 (Ala.2010); Tyson v. Macon County Greyhound Park, Inc., 43 So.3d 587 (Ala.2010); Barber v. Houston County Econ. Dev. Ass’n, [Ms. 1090444] (on rehearing); Surles v. City of Ashville, [Ms. 1080826, Jan. 29, 2010].(Ala.2010) ; Barber v. Cornerstone Cmty. Outreach, Inc., 42 So.3d 65 (Ala.2009). Compare State v. McPhail, 182 Miss. 360, 368-69, 180 So. 387, 388-89 (1938):
“In [the area of Mississippi known as the Gold Coast] for some time, and in numerous places, intoxicating liquors have been openly displayed and sold in the manner as if in licensed saloons, and gambling in its most vicious forms has been carried on. The salient facts with reference to the general situation in the area in question, have persisted for such a considerable length of time; have been of such glaring notoriety and have aroused such general public interest; have been the subject of such extensive public comment both in the daily and weekly press and of common conversation throughout the state; have been so open and flagrant and without dispute *736 anywhere that the court may notice as a matter of current history the import of said facts, when taken in connection with the evidence before us dealing with those facts.”
Based on the foregoing, we conclude that the statutes discussing the powers and duties of the attorney general do not authorize the attorney general to interfere with or to direct and control litigation being pursued by officers who are acting pursuant to directions from the governor under § 12-17-184(10), § 12-17-216, and/or § 36-13-2.
Attorney General King, Cornerstone, and FTV argue that this Court’s decision in Weaver supports their position. Because that decision is inconsistent with the reasoning and conclusions we express today, we hereby overrule Weaver.[21]
In Weaver, some subscribers of health-insurance benefits filed a class action against Blue Cross and Blue Shield of Alabama seeking declaratory relief and a refund of what they considered to be excess reserves. The subscribers later amended their complaint to add the Alabama Insurance Department ás a defendant.
“In March 1989, the circuit court entered orders certifying the plaintiffs’ class; directing the Insurance Department to perform certain tasks under certain procedural rules and to report to the court; entering partial summary judgment in favor of the plaintiffs; and denying all other pending motions. The partial summary judgment in favor of the plaintiffs was entered by the trial judge on the issue of liability, i.e., he held as a matter of law that Blue Cross was illegally calculating reserves.
“Blue Cross filed a petition for writ of mandamus or prohibition or both, in the Court of Civil Appeals. Mike Weaver, as Commissioner of Insurance, in June 1989 filed an appeal or, in the alternative, a petition for a writ of mandamus from the Court of Civil Appeals to vacate the trial court’s order.
“Attorney General Don Siegelman filed a motion on October 12,1989, in the Court of Civil Appeals to dismiss the appeal and the alternative petition fox-writ of mandamus brought by the Department of Insurance. Briefs were filed and oral argument was held on November 14, 1989, in the Court of Civil Appeals on the issue of control of litigation of the Insurance Department. The Court of Civil Appeals granted the motion to dismiss, ruling that the attorney general has the power to manage and control' all litigation on behalf of the State of Alabama and all of its depai-t-ments.
“The petition for writ of mandamus before us seeks to vacate the decision of the Court of Civil Appeals. We must *737 determine whether the attorney general of the State of Alabama has the authority to move to dismiss the State Insurance Department’s proceedings in the Court of Civil Appeals over the objection of the commissioner of insurance.”
570 So.2d at 676-77.
The commissioner of insurance argued, among other things, that the governor was the supreme executive and that the governor had the right to hire counsel other than the attorney general to represent the Department of Insurance. After analyzing various precedents from this State and other states concerning the powers of the attorney general, this Court concluded:
“We have carefully reviewed the law and the precedents in this case. The overwhelming authority supports the decision of the Court of Civil Appeals that the attorney general has the power to manage and control all litigation on behalf of the State of Alabama. We hold that the attorney general of the State of Alabama has the authority to move to dismiss the State Department of Insurance’s proceedings in the Court of Civil Appeals over the objection of the commissioner of insurance.
“We recognize that there may be times when the Governor disagrees with the attorney general about matters in litigation. Although we determine that the attorney general is authorized to direct the course of all litigation involving the State and its agencies, the Governor, as ‘chief magistrate’ of the State, may intervene in any such litigation. Rule 24, [Ala]. R. Civ. P. As an interve-nor, the Governor may express his views and take positions contrary to those argued by the attorney general.”
570 So.2d at 684 (footnotes omitted).
Justices Houston, Steagall, and Maddox dissented from the main opinion in Weaver. Justice Steagall, joined by Justice Maddox, offered the following opinion, which we find meritorious:
“The Governor is the highest constitutional officer in this state. Our Constitution provides that ‘the supreme executive power of this state shall be vested in a chief magistrate, who shall be styled “the Governor of the state of Alabama.” ’ Article V, § 113, Alabama Constitution of 1901. ‘The Governor shall take care that the laws be faithfully executed.’ Article V, § 120.
“I believe that this Court would be correct and wise to allow the Governor to make important executive decisions affecting the lives and health of our citizens. Indeéd, this is required by our Constitution. '
“This view is not inconsistent with the right of the attorney general to intervene in a case when he disagrees with the action of a state agency. The Supreme Court of Mississippi stated this position in State ex rel. Allain v. Mississippi Public Service Comm’n, 418 So.2d 779, 784 (Miss.1982):
“ ‘The unique position of the Attorney General requires that when his views differ from or he finds himself at odds with an agency, then he must allow the assigned counsel or specially appointed counsel to represent the agency unfettered and uninfluenced by the Attorney General’s personal opinion. If the public interest is involved, he may intervene to protect it.’
“I think this position is practical and is in the best interests of all the people of this state. I, therefore, respectfully dissent.”
570 So.2d at 690.
In a similarly well reasoned, but more thorough dissent, Justice Houston stated:
“POWER! That is what this appeal is about. This appeal does not address in *738 any way the merits of the underlying litigation.
“ ‘[W]hich entity [the attorney general or the commissioner of insurance] controls whether [Mike Weaver, as commissioner of insurance of the State of Alabama] remains a party to the appeal^]’
“This is the issue posited in the majority opinion of the Court of Civil Appeals. To me, the issue is much broader.
“Does the attorney general of the State of Alabama under his legislative mandate to direct and control litigation concerning the interest of the State or any department thereof, Ala. Code 1975, § 86-15-21, have the power to make substantive policy decisions contrary to the decisions of the department or agency that he is representing?”
570 So.2d at 684-85. After a lengthy discussion of constitutional and statutory provisions concerning the governor, the attorney general, and the Department of Insurance, Justice Houston concluded:
“When considered in the light of the Governor’s constitutional mandate, the seemingly broad power granted to the attorney general by § 36-15-21 to direct and control litigation is clearly restricted. To give the section the broad construction that the majority gives it clearly puts § 36-15-21 at odds with §§ 113 and 120 of our Constitution, for it allows the attorney general’s statutory or even common law power (if such was not ‘altered or repealed’ by § 36-15-21, see Ala.Code 1975, § 1-3-1) to detract or take away from the Governor’s ‘supreme executive power.’ (Emphasis added.) When a statute is susceptible to two constructions, and one would render it unconstitutional while the other would not, we must give the statute the construction that would make it constitutional. Whitson v. Baker, 463 So.2d 146 (Ala.1985).
“In my opinion, the phrase ‘[a]ll litigation concerning the interest of the State, or any department thereof, shall be under the direction and control of the attorney general’ does not vest in the attorney general the authority to make substantive policy decisions concerning matters in litigation.
“From time to time, Governors have intervened in cases in which they thought the public interest was involved and was not being adequately protected. See Continental Telephone Co. of the South v. Alabama Public Service Commission, 479 So.2d 1195 (Ala.1985); General Telephone Co. of the Southeast v. Alabama Public Service Commission, 356 So.2d 612 (Ala.1978); Alabama Public Service Commission v. South Central Bell Telephone Co., 348 So.2d 443 (Ala.1977); Alabama Gas Corp. v. Wallace, 293 Ala. 594, 308 So.2d 674 (1975); State v. Alabama Public Service Commission, 293 Ala. 553, 307 So.2d 521 (1975). Under the majority opinion, does the attorney general, by his authority to direct and control litigation involving the State’s interest, have authority to dismiss the intervention of the Governor, the supreme executive?
“Recently, this Court issued its writ of certiorari without being requested to do so by the attorney general or anyone else. White v. Reynolds Metals Co., 558 So.2d 373 (Ala.1989). White involved millions of dollars of State funds (franchise tax on corporations that were incorporated in states other than Alabama). Under the majority opinion, would the attorney general, by his authority to direct and control litigation involving the State’s interest, have the right to prevent this Court from issuing its writ of certiorari in litigation involving the State’s interest?
*739 “The Legislature has designated that the substantive policy decisions in the underlying matters in litigation are the responsibility of another member of the executive department. The power to direct and control normally gives the attorney general the authority to decide what is and what is not worth taking to court or defending there and what is or what is not to be appealed, and the executive official involved should normally yield to the judgment of the attorney general so that the State may speak to the courts in a consistent and coherent manner. However, the attorney general’s right to manage litigation must end when it interferes with a State agency’s authority and duty to enforce substantive matters relating to its legislative purpose. When this happens, I would adopt the position of the Mississippi Supreme Court:
“ ‘The unique position of the Attorney General requires that when his views differ from or he finds himself at odds with an agency, then he must allow the assigned counsel or a specially appointed counsel to represent the agency unfettered and uninfluenced by the Attorney General’s personal opinion. If the public interest is involved, [the Attorney General] may intervene to protect it.’
“State v. Mississippi Public Service Commission, 418 So.2d 779, 784 (Miss.1982).”
570 So.2d at 688-89 (emphasis added, other than as indicated).
We cannot agree to extend § 36-15-21 or any other statute concerning the power and duties of the attorney general in a manner that effectively negates the authority under which the Governor has acted here. The fact that Weaver announced a position inconsistent with our conclusion today does not detract from this Court’s obligation to properly ascertain and apply the law. See Ex parte Marek, 556 So.2d 375, 382 (Ala.1989) (doctrine of stare deci-sis does not render the courts helpless to correct their past errors); Ex parte Cranman, 792 So.2d 392, 404 (Ala.2000) (plurality decision) (“We cannot, in blind obedience to the doctrine of stare decisis, continue to accept an expansive application of caselaw characterizing as a discretionary function conduct remote from the execution of governmental policy; to do so would perpetuate an erroneous construction of the Constitution.”); Marsh v. Green, 782 So.2d 223, 232 (Ala.2000) (“[W]hen the Constitution is misinterpreted, the doctrine of stare decisis is not entitled to the deference it otherwise receives.”).[22]
As all the parties before us note in their respective briefs, Attorney General King discussed the meaning of the governor’s explicit constitutional authority and duties in his brief to this Court in State ex rel. King v. Morton, 955 So.2d 1012 (Ala.2006). That brief stated:
*740 “While the Executive Branch has several members (see Ala. Const.1901, § 112), only one of those members, the Governor, is at the top of the chain of command:
“ ‘The supreme executive power of this state shall be vested in a chief magistrate, who shall be styled “The Governor of the State of Alabama.” ’
“Ala. Const.1901, § 118. Only the Governor is given this duty: ‘The Governor shall take care that the laws be faithfully executed.’ Ala. Const.1901, § 120.
“Defendants contend that the grant of ‘supreme executive power’ does not require that the Governor play any role in executing the [Community Services Grants] Act [Ala.Code 1975, § 29-2-120, et seq.]. However, the word ‘supreme’ means something and the word is in the Constitution for a reason. A ‘supreme’ power or right is one that is ‘highest; superior to all others.’ Black’s Law Dictionary [1481] 8th ed. (2004). When construing a document, the Court must presume ‘that every word, sentence or provision was intended for some useful purpose, has some force and effect, and that some effect is to be given to each, and also that no superfluous words or provisions were used.’ Ex parte Uniroyal Tire Co., 779 So.2d 227, 236 (Ala.2000).
“Clearly ‘supreme’ means that the Governor holds a higher rank and power than other members of the Executive Branch, and this was clearly recognized by the drafters of Alabama’s current Constitution:
“ ‘The Governor is the chief executive officer of the state. The Constitution clothes him with the duty of seeing to it that the laws are faithfully executed. What folly would it be to clothe him with that power and yet say to him you have no control over the inferior executive officers of the commonwealth .... ’
“Official Proceedings of the Constitutional Convention of 1901 (Vol. 1) at 882-82, quoted in Parker v. Amerson, 519 So.2d 442, 444 (Ala.1987). There is a constitutional hierarchy within the Executive Branch and one office — the Governor — is at its top.
“The wisdom of this system is self-evident. The Executive Branch is a large fleet with many ships (departments, boards and agencies), and a large fleet needs an admiral. There must be a single voice speaking through the various members and a single oversight over them all if they will ever work for the public good. If each of the many boards and commissions of the Executive Branch worked only for its own purpose, if none had to answer to any higher executive power, each would go its own direction, canceling others out at best and working squarely against others at worst.” •
Our decision today is consistent with the fundamental but simple notion that “there is a constitutional hierarchy within the executive branch and one office — the Governor — is at its top.” The “supreme executive power” is more than a “mere verbal adornment” of the office of Governor.[23]

TV. Conclusion

A writ of mandamus will be issued where there is “(1) a clear legal right in the petitioner to the order sought; (2) an imperative duty upon the respondent to perform, accompanied by a refusal to do so; (8) the lack of another adequate *741 remedy; and (4) properly invoked jurisdiction of the court.” Ex parte Integon Corp., 672 So.2d 497, 499 (Ala.1995). Based on our discussion above, we hold that the actions of the attorneys and other officers authorized by Governor Riley to act in this case are not “nullities,” despite the lack of approval by the Attorney General and the District Attorney, and that the Attorney General may not take over or countermand the litigation efforts of those officers in either the trial court or in this Court. The counsel authorized by the Governor have the right to represent the State in this case and to see it through to completion. Also, Cornerstone and FTV have no right to complain in any event. McCain v. City of Montgomery, 38 Ala.App. 568, 571, 92 So.2d 678, 680 (1956) (“So long as the conduct of [a] special prosecutor comports to due and orderly procedure a defendant is in no position to complain as to who conducts the prosecution.”)
Based on the foregoing, Attorney General King’s motion to dismiss is denied; the State and the Riley defendants’ petition for a writ of mandamus is granted; and the trial court’s March 8, 2010, and March 16, 2010, orders are vacated. Further, the trial court is ordered to expedite consideration of the forfeiture proceeding.
MOTION TO DISMISS DENIED; PETITION GRANTED; WRIT ISSUED WITH INSTRUCTIONS.
WOODALL, STUART, SMITH, BOLIN, PARKER, and SHAW, JJ., concur.
LYONS, J., concurs specially.
COBB, C.J., concurs in part and concurs in the result.

. The director of the Department of Public Safety is appointed by, and serves at the pleasure of, the governor. Ala.Code 1975, § 32-2-1. The statutes relating to the Department of Public Safety authorize the governor to “establish and maintain a state highway patrol.” Ala.Code 1975, § 32-2-20. “Members of the state highway patrol ... have the powers of peace officers in this state and may exercise such powers anywhere within the state.” Ala.Code 1975, § 32-2-22.

. The members of die Alcoholic Beverage Control Board are "appointed by the Governor, with the advice and consent of the Senate, [and] ... may be suspended or removed by the Governor at his pleasure.” Ala.Code 1975, § 28-3-40. The administrator is appointed by the Board. Ala.Code 1975, § 28-3-42(a). Agents of the Alcoholic Beverage Control Board may be commissioned by the Board “to make arrests and execute search warrants and have the same authority as designated to peace officers as ... authorized by law.” Ala.Code 1975, § 28-3-43(a)(6).

. The Task For.ce executed the search warrant with -the, assistance of agents from the Alcoholic Beverage Control Board and from the Alabama Bureau of Investigation, which is the investigative division of the Department of Public Safety. See Ala.Code 1975, § 32-2-3(a)(5).

. Chad Dickie, a manager at the EC, was also named as an interested party.

. Hereinafter, references to the "Riley defendants” include Tyson, and not Barber.

. Before the issuance of the trial court’s March 8 and 16 orders, Attorney General BCing had simply adopted a position of nonintervention. If not for the subsequent stay by this Court of the trial court’s orders, those orders would have raised separation-of-powers issues. See Piggly Wiggly No. 208, Inc. v. Dutton, 601 So.2d 907, 910-11 (Ala.1992); State v. Sharp, 893 So.2d 566 (Ala.Crim.App.2003); Edmondson v. Pearce, 91 P.3d 605 (Okla.2004); and Triple A Mach. Shop, Inc. v. California, 213 Cal.App.3d 131, 261 Cal.Rptr. 493 (1989).

. In his letter to Colonel Murphy and Administrator Folmar, Attorney General King also "advise[d] [them] to refrain from further raids without obtaining the proper warrants and • respecting the due process proceedings." Colonel Murphy and Administrator Folmar responded:
"We ... strongly dispute your implication that prior law enforcement operations were undertaken ‘without obtaining the proper warrants and respecting the due process proceedings.’ You as Attorney General already know that warrants are not required under the Constitution in these circumstances. You know that it is entirely proper for undercover agents to visit businesses that have opened themselves to the public and that such agents who have probable cause to believe that there is ongoing criminal activity have full authority to make arrests or seize criminal contraband without obtaining warrants. Your suggestion that a warrant is required in such circumstances is both surprising and misleading.”
We note that it is well settled that "[t]here is no reasonable expectation of privacy in the public areas of a commercial establishment, or in areas of a commercial establishment where the public is invited to enter and to transact business. A warrant is needed only for areas not open to the public.” 79 C.J.S. Searches § 31 (2009); see also Maryland v. Macon, 472 U.S. 463, 469 (1985) ("The ... expectation that the possibly illegal nature of a product will not come to the attention of the authorities, whether because a customer will not complain or because undercover officers will not transact business with the store, is not one that society is prepared to recognize *717 as reasonable. The officer's action in entering the bookstore and examining the wares that were intentionally exposed to all who frequent the place of business did not infringe a legitimate expectation of privacy and hence did not constitute a search within the meaning of the Fourth Amendment.” (citations omitted)).

. We note that the trial court reserved the question of subject-matter jurisdiction as to the declaratory-judgment action. We proceed here only in relation to the forfeiture proceeding-

. We need not decide whether, in a dispute as here between the governor and another constitutional officer over their respective fields of authority, the other officer ever may defend his or her "turf” on the ground that the governor’s determination that the other officer is not "faithfully executing” the law is affected by bad faith or some comparable deficiency. As discussed below, that clearly is not the case here. See discussion infra.

. See also State ex rel. King v. Morton, 955 So.2d 1012 (Ala.2006). In Morton, the State argued that a statute was unconstitutional for not giving the governor enough authority over an “executive commission.” We acknowledged the argument of the State, but noted
"that the Governor is not totally without control of the Executive Commission. The Executive Commission is composed of executive department officers. If the State is correct that §113 gives the Governor supreme control of the executive department, then the Governor perforce has a measure of control over the Executive Commission. Additionally, Ala. Const.1901, Art. V, § 121, gives the Governor power to monitor executive department agencies:
" ‘The governor may require information in writing, under oath, from the officers of the executive department, named in this article, or created by statute, on any subject, relating to the duties of their respective offices, and he may at any time require information in writing, under oath, from all officers and managers of state institutions, upon any subject relating to the condition, management and expenses of their respective offices and institutions. Any such officer or manager who makes a willfully false report or fails without sufficient excuse to make the required report on demand, is guilty of an impeachable offense.’
“Moreover, Ala.Code 1975, § 6-5-4, provides that the Governor may institute an action to recover public funds that have been lost by neglect or default or that have been wrongfully expended or disbursed or wrongfully used by an officer of the executive department or that have been wrongfully received from him or her. Thus, by its failure to establish that the Governor has absolutely no control and its failure to articulate with any specificity the degree of involvement in excess of the control already available by law that § 113 requires in order for the Act to be valid, the State has failed to meet its burden to prove that the Act is an unconstitutional violation of the separation-of-powers doctrine and,to overcome the presumption that the Act is constitutional.”
955 So.2d at 1020-21 (emphasis other than on word “supreme” added). Thus, in Morton, we rejected the argument of the State because it failed to meet its burden of showing what control by the governor was missing that supposedly was necessary to make the act in question constitutional. We did not reject the State’s argument that the governor had supreme executive power pursuant to the constitution, and we recognized the .governor’s "perforce" authority under § 113.

. In contrast to the foregoing expressions of authority and control vested in the governor, conspicuously absent from our law is any constitutional or statutory provision stating that the attorney general can direct the governor to do anything. There is, as one would expect given the governor's role as "supreme -executive" and "chief magistrate,” no constitutional or statutory provision stating that the attorney general can interfere with the governor’s legitimate exercise of his right to "take care that the laws be faithfully executed."
We also note that, on at least one occasion, this Court has avoided the question whether the attorney general can act in contravention of a directive from the governor. See Larson v. State ex rel. Patterson, 266 Ala. 589, 605-06, 97 So.2d 776, 791 (1957) (" ‘The appellants moved to dismiss the bill of complaint and demurred to the bill of complaint on the *725 ground that, for aught that appeared, the Attorney General acted contrary to and in direct violation of the orders of the Governor in instituting this action.... ’ At the present stage of the case we are not called upon to decide the specific point raised. Appellants apparently agree that the Attorney-General is authorized to bring the suit unless he has acted 'contrary to and in direct violation of the orders of the Governor.’ Assuming, with.out deciding, that the suit cannot be maintained if such orders are given, we see no necessity of the bill negating such action by the Governor.”).

. The language concerning the governor’s employment of counsel was added to the predecessor statute to § 36-13-2 in 1911. See Act No. 347, Ala. Acts' 1911. In Smith, the act was declared unconstitutional because it contained subject matter that was not sufficiently referenced in the title. 187 Ala. at 423-25, 65 So. at 945-46. Ultimately, however, the language concerning the governor’s employment of counsel was codified in the 1923 Code of Alabama at § 764. The language has remained substantially unchanged since that time.

. In addition to the reasons offered by Justice Houston, to which we refer the reader, we note that the phrase “as may be prescribed by law” in § 137 is used not just in relation to the attorney general, but in relation to other officers (such as the commissioner of the Department of Agriculture and Industries) who did not exist at common law and whose duties and powers are specifically prescribed by other constitutional provisions or by statute. It fairly may be questioned whether the delegates to the 1901 Constitutional Convention intended the phrase "as may be prescribed by law” to mean one thing for the attorney general and another for the other officers described in the same sentence. As used elsewhere in the constitution, the phrase "as may be prescribed by law” clearly refers to some statute or regulation that is to be enacted. See Ala. Const.1901, §§ 48, 76, 104(17), 111.01, 115, 123, 134, 140, 174, 175, 236, 270 (Off. Recomp.).
Further, we note that the Weaver Court did not take note of the history behind the office of attorney general in Alabama. In the 1819 Constitution, the attorney general was not discussed in the article describing the executive department, art. IV, but in the article describing the judicial department, art. V, § 18, which stated "[tjhere shall be an attorney-general for the state, and as many solicitors as the general assembly may deem necessary, to be elected by joint vote thereof.” Unlike the governor, who was elected by the people, see Art. IV, § 2, the officers in the judicial department — including both judges and the attorney general — were "elected by joint vote of both houses of the general assembly.” See 1819 Ala. Const., art. V, § 12. The foregoing provisions concerning the attorney general were carried forward in the article concerning the judicial department in the 1861 Ala. Const., art. V, § 17. The attorney general was not listed among the officers in the executive department until the 1868 Ala. Const., art. V, § 1. As one court has noted when examining a similar history, "[b]y removing the traditional executive office of Attorney General to the judicial department and establishing a tri-partite state government, with separate legislative, executive and judicial departments, the framers of the first Virginia Constitution in effect abrogated any common law executive powers the holder of that office may have had. ... [H]is return to the executive department did not revive the common law powers of the office.” Manchin v. Browning, 170 W.Va. 779, 785, 296 S.E.2d 909, 915 (1982).
Finally, we note that the main opinion in Weaver made note of the decision of the Utah Supreme Court in Hansen v. Barlow, 23 Utah 2d 47, 456 P.2d 177, 178 (1969), in concluding that providing the attorneys general of the various states common-law duties was the general rule. The court did not discuss the difference in the wording of § 137 of the Alabama Constitution ("such duties as may be prescribed by law”) with the Utah constitu *728 tional provision at issue in Hansen, 23 Utah 2d at 48, 456 P.2d at 178 (" ‘[t]he Attorney General shall be the legal adviser of the State Officers and shall perform such other duties as may be provided by Law' "). Nor did the court in Weaver compare the specific constitutional provisions of other states. In any event, a number of courts have reached the opposite conclusion in well reasoned decisions. For example, even Martin v. Thornburg, 320 N.C. 533, 359 S.E.2d 472 (1987), which was relied upon by the main opinion in Weaver, 570 So.2d at 683, recognized that provisions similar to those in the 1901 Constitution do not include a grant of common-law powers to the attorney general. 320 N.C. at 545, 359 S.E.2d at 479 (“Article III, § 7(2), [of the North Carolina Constitution] provides that the duties of the Attorney General and the other elective State officers 'shall be prescribed by law ’ (Emphasis added.) The North Carolina Constitution does not prescribe the duties of the Attorney General.”); see, e.g., Ariz. Const, art. 5, § 9 ("The powers and duties of Secretary of State, State Treasurer, Attorney-General, and Superintendent of Public Instruction shall be as prescribed by law.”); Gershon v. Broomfield, 131 Ariz. 507, 508, 642 P.2d 852, 853 (1982) ("The Attorney General has no common law powers; whatever powers are possessed by the holder of that office must be found in the Arizona Constitution or in the Arizona statutes.”); Ark. Const, art. 6, § 22 ("The Treasurer of State, Secretary of State, Auditor of State, and Attorney-General shall perform such duties as may be prescribed by law.”); Parker v. Murry, 221 Ark. 554, 559, 254 S.W.2d 468, 471 (1953) ("It thus appears obvious that the official position of the Attorney General is a constitutional one, but that his duties are purely statutory.”); Idaho Const, art. IV, § 1 (providing that the attorney general "shall perform such duties as are prescribed by this Constitution and as may be prescribed by law”); Padgett v. Williams, 82 Idaho 28, 36, 348 P.2d 944, 948 (1960) ("[T]he office of attorney general is not constitutionally vested with any common law powers and duties that are immune to legislative change.”); Md. Const, art. V, § 3(b) ("The Attorney General shall have and perform any other duties and possess any other powers, and appoint the number of deputies or assistants, as the General Assembly from time to time may prescribe by law.”); and State ex rel. Attorney General v. Burning Tree Club, Inc., 301 Md. 9, 32-33, 481 A.2d 785, 797 (1984) ("[T]he Attorney General of Maryland has only such powers as are vested in him by the Constitution of Maryland and the various enactments of the General Assembly of Maryland. ... [T]he Attorney General of Maryland possesses no common law powers.” (citations omitted)).

. Even if the common-law powers of the attorney general included such a right, we question whether such powers, either inferred under § 137 or extended by legislative grant in § 36-15-1.1, could override the direct and explicit constitutional provisions giving the governor "supreme executive power” to "take care that the laws be faithfully executed.” See Jefferson County v. Alabama Criminal Justice Info. Ctr. Comm., 620 So.2d 651, 658 (Ala.1993) (discussing the general principle that implied powers cannot exceed or conflict with express powers); see also, e.g., Village of Perrysburg v. Ridgway, 108 Ohio St. 245, 253-54, 140 N.E. 595, 597 (1923) ("The delegation of political power is either expressed or implied; but it must always be remembered that implied powers delegated must be such as are naturally or necessarily incidental or auxiliary to the express power, and, as such, the implied power cannot be in any wise destructive of, or in conflict with, an express delegation of power.”). Furthermore, an affirmative answer to this question would place the constitution in conflict with itself.

. Section 12-17-184(1) and § 12-17-216 contain similar provisions as to the power of the governor.

. In addition, we note that the last sentence of § 12-17-216, Ala.Code 1975, clearly contemplates that only when the attorney is requested to act by the attorney general shall he or she carry the "designation] as a special assistant attorney general.” Yet, the other provisions of the statute in no way differentiate between the authority held by a supernumerary attorney called upon by the governor and one called upon by the attorney general.

. One could assume that if the grant of authority to the governor in §§ 12-17-184(10) and 12-17-216 were to be subject to the countermand decision of the attorney general, those statutes themselves might have so indicated, rather than expressing the same authority on die part of both the governor and the attorney general.

. Clearly, the legislature has the power to prescribe powers to each constitutional executive official within some sphere. Does this mean, however, that the legislature can give the commissioner of the Department of Agriculture and Industries or the secretary of state any authority or "duties” it might choose, even duties that would enable that official to act contrary to the governor in the exercise of the explicit and direct constitutional authority given the governor by the constitution? We think not. The legislature, .even though acting under the authority of § 137 in doing so, cannot grant such officers authority contrary to the direct and explicit constitutional provisions by which the people of Alabama have vested the governor, as "chief magistrate” with "[t]he supreme executive power of this state,” § 113, and that charge the governor to "take care that the laws be faithfully executed.” § 120.

. In the appeal of the preliminary injunction in the above-discussed declaratory-judgment actions, Cornerstone and FTV supported their argument, in part, by citing remarks made by Attorney General King concerning electronic bingo that they considered favorable to their position.

. Further, the declaratory-judgment actions described by Attorney General King appear to contemplate only a request for determinations as to "whether” gaming machines are illegal under the constitution and laws of Alabama. As this Court has recently ruled in a similar declaratory-judgment action with respect to machines and operations of this nature, the courts of this State have no subject-matter jurisdiction over requests for advisory opinions. Etowah Baptist Ass’n v. Entrekin, 45 So.3d 1266 (Ala.2010). Accordingly, Attorney General King's proposed course of conduct would be a nullity. Moreover, with certain exceptions not applicable here, the courts of this State do not have subject-matter jurisdiction in independent civil actions to interfere with the enforcement of the criminal laws. See Tyson v. Macon County Greyhound Park, Inc., 43 So.3d 587 (Ala.2010).

. Other cases relied upon by Attorney General BCing, Cornerstone,. and FTV do not involve the issue whether the attorney general can direct and control litigation that is being pursued by an attorney authorized or directed by the governor. We therefore do not perceive such other cases as being in conflict with our holding today. See Chapman v. Gooden, 974 So.2d 972 (Ala.2007) (attorney general intervened and assumed control over a case involving the secretary of state; governor's power not involved); Graddick v. Galanos, 379 So.2d 592 (Ala.1980) (attorney general superintending litigation over the objection of a district attorney; governor’s power not involved); State ex rel. Carmichael v. Jones, 252 Ala. 479, 41 So.2d 280 (1949) (attorney general could, over the objection of the director of the Department of Revenue, settle an action the attorney general had filed; governor’s power not involved); In re Stephenson, 113 Ala. 85, 21 So. 210 (1897) (attorney general, rather than county solicitor, was the proper party to request a remedial writ; governor's power not involved).

. The erroneous nature of the conclusion reached in Weaver is further revealed by a contradiction inherent in its own holding. In a case upholding the right of the attorney general to represent the Department of Insurance and dismiss an appellate proceeding on its behalf, the Weaver Court purported to recognize the right of the governor to intervene if he disagreed with the position of the attorney general. Such a right of intervention by the governor under such circumstances obviously begs the question — to what end? If the position of the attorney general cannot be countermanded by the governor, what is the purpose of allowing intervention? The only alternative would be to read Weaver as standing for the proposition that the governor can intervene to offer an opinion that can have no bearing on the right of the attorney general to do as he pleases as counsel of record; to so read Weaver would reduce the governor to the position of an amicus curiae.

. Consistent with the foregoing, we find the other arguments of the respondents unpersuasive.