Rel: 11/21/2014

**Notice:** This opinion is subject to formal revision before publication in the advance sheets of **Southern Reporter**. Readers are requested to notify the **Reporter of Decisions**, Alabama Appellate Courts, 300 Dexter Avenue, Montgomery, Alabama 36104-3741 ((334) 229-0649), of any typographical or other errors, in order that corrections may be made before the opinion is printed in **Southern Reporter**.

# SUPREME COURT OF ALABAMA

OCTOBER TERM, 2014-2015

_____

**1130388**

_____

**Houston County Economic Development Authority**

**v.**

**State of Alabama**

**Appeal from Houston Circuit Court**
**(CV-12-900266)**

PER CURIAM.

The Houston County Economic Development Authority ("HEDA") appeals from a judgment condemning 691 allegedly illegal gambling devices, $288,657.68 in cash, and various documents allegedly related to illegal gambling. We affirm.

## I. Facts and Procedural History

On July 25, 2012, officers from the Houston County Sheriff's Office, the Alabama Department of Public Safety, and the Office of the Alabama Attorney General executed a search warrant at a bingo gaming facility known as Center Stage Alabama ("Center Stage") located in Houston County. As a result of the search, the State of Alabama confiscated 691 allegedly illegal gambling devices, which included electronic-gaming devices, computer servers, and gaming tables used for a roulette-style game called "Roubingo"; $288,657.68 in United States currency; and various documents allegedly related to illegal gambling. On July 26, 2012, the State instituted a civil-forfeiture proceeding in the Houston Circuit Court under the provisions of § 13A-12-30, Ala. Code 1975, seeking forfeiture of the items and currency seized during the July 25 search of Center Stage.

On April 16, 2013, HEDA sought, and was granted, the right to intervene in the forfeiture action. HEDA is the operator of Center Stage.[1] The electronic-gaming devices used

---

[1]HEDA leases the facility premises from Center Stage Alabama, Inc. Center Stage Alabama, Inc., was initially named as a defendant in the forfeiture action, but it was dismissed on the ground that it had no interest in the seized property.

in the operation of Center Stage were leased by HEDA from each gaming device's respective manufacturer or developer.[2] HEDA purportedly operated Center Stage under a "Class C Special Permit to Operate Bingo Games" granted by the Houston County Commission to operate charitable bingo games under Amendment No. 569 to the Alabama Constitution of 1901.[3] In addition to offering electronic gaming and Roubingo, Center Stage also offered traditional "paper bingo," live entertainment, and a bar.

A bench trial was conducted beginning on August 7, 2013. Over three days, the trial court heard live testimony from law-enforcement personnel who had participated in the investigation and search of Center Stage. The testimony of several witnesses was received via submission of deposition

---

[2]Two of the developers, Baron America, LLC, and Select Electronic Development, Inc. ("SED"), intervened in the forfeiture action, each asserting ownership of some of the equipment seized from Center Stage. Before trial both Baron America and SED filed formal notice with the trial court relinquishing their claims to any of the seized property. Neither Baron America nor SED participated in the trial of this matter, and they are not parties to this appeal.

[3]Amendment No. 569 was proposed by Act No. 94-606, Ala. Acts 1994, p. 1120, submitted at the November 8, 1994, general election, and proclaimed ratified January 6, 1995. See Local Amendment, Houston County, § 1, Ala. Const. 1901 (Off. Recomp.).

transcripts; one of those witnesses was HEDA's expert witness, who generally testified that the electronic-gaming devices seized by the State operated in such a way as to comply with the definition of "bingo" as defined by this Court in previous cases discussed infra. The parties also offered into evidence over 50 exhibits, including video of game play at Center Stage taken by an undercover officer. Following the close of evidence, the parties submitted posttrial briefs.

On October 17, 2013, the trial court entered an order and final judgment. The trial court concluded that the devices, including the electronic devices, computer servers, and Roubingo tables, constituted illegal gambling devices. The trial court further concluded that the United States currency and other seized "gambling paraphernalia" was being used in connection with the illegal gambling operation. The trial court ordered that "the gambling devices ... be destroyed or otherwise disposed of by the State of Alabama" and ordered the State to deposit the seized currency into the State's General Fund. The trial court denied HEDA's postjudgment motion, and HEDA timely appealed.

1130388

## II.  Standard of Review

The trial court issued its judgment following a bench trial at which evidence was presented ore tenus.

"Our ore tenus standard of review is well settled. '"When a judge in a nonjury case hears oral testimony, a judgment based on findings of fact based on that testimony will be presumed correct and will not be disturbed on appeal except for a plain and palpable error."' Smith v. Muchia, 854 So. 2d 85, 92 (Ala. 2003)(quoting Allstate Ins. Co. v. Skelton, 675 So. 2d 377, 379 (Ala. 1996)).

"'"The ore tenus rule is grounded upon the principle that when the trial court hears oral testimony it has an opportunity to evaluate the demeanor and credibility of witnesses." Hall v. Mazzone, 486 So. 2d 408, 410 (Ala. 1986). The rule applies to "disputed issues of fact," whether the dispute is based entirely upon oral testimony or upon a combination of oral testimony and documentary evidence. Born v. Clark, 662 So. 2d 669, 672 (Ala. 1995). The ore tenus standard of review, succinctly stated, is as follows:

"'"[W]here the evidence has been [presented] ore tenus, a presumption of correctness attends the trial court's conclusion on issues of fact, and this Court will not disturb the trial court's conclusion unless it is clearly erroneous and against the great weight of the evidence, but will affirm the judgment if, under any reasonable aspect, it is supported by credible evidence."'

5

1130388

> "Reed v. Board of Trs. for Alabama State Univ., 778
> So. 2d 791, 795 (Ala. 2000) (quoting Raidt v. Crane,
> 342 So. 2d 358, 360 (Ala. 1977)).  However, 'that
> presumption [of correctness] has no application when
> the trial court is shown to have improperly applied
> the law to the facts.'  Ex parte Board of Zoning
> Adjustment of Mobile, 636 So. 2d 415, 417 (Ala.
> 1994)."

Kennedy v. Boles Invs., Inc., 53 So. 3d 60, 67-68 (Ala. 2010).

## III.  Analysis

HEDA raises a number of issues on appeal.  First, HEDA contends that the language of the constitutional amendment permitting bingo in Houston County, the related implementing statute, and the county bingo resolution exempt the property in this case from seizure and forfeiture under Alabama's general antigambling laws, including § 13A-12-30.  Second, HEDA argues that a bond-validation proceeding related to the construction and development of what is now Center Stage conclusively established the legality of the electronic-gaming operation.  Third, HEDA argues that, even if § 13A-12-30 applies, the State failed to meet its burden to establish that the seized gaming devices were illegal gambling devices and that the evidence instead demonstrated that the devices played legal bingo as that game has been defined by this Court.

6

1130388

Finally, HEDA argues that there was no evidence indicating that the seized currency or documents were used in or related to illegal gambling.

The central issue in this case is whether the gaming devices seized by the State were illegal gambling devices or whether they were used to conduct lawful "bingo" games, authorized by Amendment No. 569. We address that issue first.

### A. Whether the seized gaming devices played the "traditional game of bingo."

Amendment No. 569 authorizes "bingo" to be played in Houston County under certain circumstances.[4] Like most of Alabama's local constitutional amendments relating to bingo, Amendment No. 569 does not expressly define the term "bingo." The implementing legislation for Amendment No. 569, however, does provide that the term "bingo" refers to "[t]he game, commonly known as bingo, where numbers or symbols on a card are matched with numbers or symbols selected at random." § 45-35-150(1), Ala. Code 1975.

---

[4]Amendment No. 569 provides, in part: "The operation of bingo games for prizes or money by certain nonprofit organizations and certain private clubs for charitable, educational, or other lawful purposes shall be legal in Houston County, subject to any resolution or ordinance by the county commission as provided by law regulating the operation of bingo."

1130388

This Court repeatedly has held that "bingo" is a form of lottery prohibited by Ala. Const. 1901, Art. IV, § 65. See, e.g., Barber v. Cornerstone Cmty. Outreach, Inc., 42 So. 3d 65, 78 (Ala. 2009); City of Piedmont v. Evans, 642 So. 2d 435, 436 (Ala. 1994). We therefore begin our analysis by emphasizing once again that the various constitutional amendments permitting "bingo" are exceptions to the general prohibition of § 65 and that, as such, they must be "narrowly construed." As we held in Cornerstone:

> "'Since 1980, Alabama has adopted various constitutional amendments creating exceptions to § 65, specifically allowing the game of bingo under certain circumstances. See Ala. Const. [1901], Amendments 386, 387, 413, 440, 506, 508, 542, 549, 550, 565, 569, 599, and 612.' (Emphasis added.) Thus, the bingo amendments are exceptions to the lottery prohibition, and the exception should be narrowly construed."

42 So. 3d at 78 (quoting Opinion of the Justices No. 373, 795 So. 2d 630, 634 (Ala. 2001)).

In addition to this fundamental principle of "narrow construction," we also recognized in Cornerstone the need, "except where the language of a constitutional provision requires otherwise," to "look to the plain and commonly understood meaning of the terms used in [the constitutional]

8

provision to discern its meaning." 42 So. 3d at 79. Furthermore, we noted that, "'[a]lthough a legislative act cannot change the meaning of a constitutional provision, such act may throw light on its construction.'" Id. at 79 (quoting Jansen v. State ex rel. Downing, 273 Ala. 166, 169, 137 So. 2d 47, 49 (1962)). Based on the above-described rules of construction, together with an examination of persuasive authority from other jurisdictions, we held in Cornerstone that the term "bingo" "was intended to reference the game commonly or traditionally known as bingo." 42 So. 3d at 86. Furthermore, we identified six elements that characterize the game of bingo, the list being nonexhaustive:[5]

---

[5]As we explained in Ex parte State, 121 So. 3d 337, 356 n.9 (Ala. 2013): "In describing the elements of bingo, our opinion in Cornerstone went only so far as necessary to decide the case presented there. Nowhere do we take the position that the elements listed there are exhaustive. See, e.g., Cornerstone, 42 So. 3d at 80 ('For purposes of the present case, the Riley defendants do not contend that a "bingo game" must be played only on paper cards, and we, therefore, do not address that issue.')." As we stated even more recently: "We identified in Cornerstone and we reaffirm today that the game of 'bingo' as that term is used in local constitutional amendments throughout the State is that game 'commonly or traditionally known as bingo,' 42 So. 3d at 86, and that this game is characterized by at least the six elements we identified in Cornerstone. Id." State v. Greenetrack, Inc., [Ms. 1101313, April 1, 2014] ___ So. 3d ___, ___ (Ala. 2014) (emphasis added).

1130388

"Based on the foregoing, we must conclude that the term 'bingo' as used in Amendment No. 674[6] was intended to reference the game commonly or traditionally known as bingo. The characteristics of that game include the following:

"1. Each player uses one or more cards with spaces arranged in five columns and five rows, with an alphanumeric or similar designation assigned to each space.

"2. Alphanumeric or similar designations are randomly drawn and announced one by one.

"3. In order to play, each player must pay attention to the values announced; if one of the values matches a value on one or more of the player's cards, the player must physically act by marking his or her card accordingly.

"4. A player can fail to pay proper attention or to properly mark his or her card, and thereby miss an opportunity to be declared a winner.

"5. A player must recognize that his or her card has a 'bingo,' i.e., a predetermined pattern of matching values, and in turn announce to the other players and the announcer that this is the case before any other player does so.

---

[6]The constitutional amendment at issue in Cornerstone, Amendment No. 674, is worded similarly to Amendment No. 569 and states, in part: "The operation of bingo games for prizes or money by nonprofit organizations for charitable, educational, or other lawful purposes shall be legal in The Town of White Hall that is located in Lowndes County, subject to any resolution or ordinance by the town council."

10

1130388

> "6. The game of bingo contemplates a group activity in which multiple players compete against each other to be the first to properly mark a card with the predetermined winning pattern and announce that fact."

42 So. 3d at 86.

We have since stated that our analysis in Cornerstone is applicable to the other local bingo constitutional amendments in this State. State v. Greenetrack, Inc., [Ms. 1101313, April 1, 2014] __ So. 3d ___ , ___ (Ala. 2014) ("[T]he game of 'bingo' as that term is used in local constitutional amendments throughout the State is that game 'commonly or traditionally known as bingo,' 42 So. 3d at 86, and ... this game is characterized by at least the six elements we identified in Cornerstone."). Accordingly, the factors identified in Cornerstone are controlling in determining whether the gaming devices in this case are legal "bingo games" permitted by Amendment No. 569.

There are two general types of gaming devices in this case: the electronic-gaming devices, which make up the majority of the items seized by the State, and three "Roubingo" tables. With regard to the electronic devices, there were four different types of game systems available for

11

1130388

play at Center Stage: Gateway, Firefox, Imperium, and Megabucks. Each player terminal consisted of a touch-screen monitor. In order to play the electronic games at Center Stage, patrons were first required to visit a cashier and purchase a personal-identification number ("PIN"). The trial court's order described in detail how the PINs were used to play the electronic-gaming devices:

> "A. When a person wished to become a player he or she obtained a[] PIN code by paying cash or approved funds to an attendant.
>
> "B. This attendant or cashier entered the amount of cash as a credit associated with that PIN code to the network of computers, servers, and player terminals to each identified machine category.
>
> "C. Each person playing the game activated a particular player terminal or station by entering his or her PIN code;
>
> "D. Upon entry of the PIN code, the player terminal or play station machine automatically displayed the amount of credit corresponding to the cash the player provided to the attendant;
>
> "E. Each individual person decided how much to bet and then engaged in a game of chance on the respective machine;
>
> "F. If the person playing the game won the game, cash value credits were awarded to the PIN, and those credits could be used to play another game on the respective machine or on another machine in the Center Stage facility;

12

"G. If a person playing the machine had a credit remaining when he or she completed playing all the games he or she wished to play, they returned to the attendant and provided the assigned PIN code. The attendant entered the code attached to the network and thereby determined the amount of credit attached to the PIN. If there was any remaining credit, the cashier pays the remaining credit to the player in cash."

According to the testimony at trial, each type of system played "basically the same." Indeed, the trial court found that "the different identified electronic Bingo machines had a commonality in their form of operation." Once a player logged into a system by entering his or her PIN, the player selected between a number of different games. All the games were "basically the same" but displayed different symbols and backgrounds, depending on the type of game selected. The player selected the amount he or she intended to wager on each game. Each game displayed one or more five-by-five column grids populated with numbers. When the player touched the "play button" on the screen, the game rapidly generated numbers that were displayed on the side and/or bottom of the screen. The game automatically highlighted matching numbers within the grid and identified winning patterns by displaying

13

the word "daub" over the numbers forming those patterns.  In order to win the game, the player was required to touch that part of the screen displaying the word "daub" and then touch the "bingo button" on the screen.  Touching the screen in any other location had no effect.  Failing to touch the "daub" or "bingo buttons" within a specified time caused the player to lose the game.  The entire game can be played in a matter of seconds.

The testimony was disputed as to whether players of the electronic machines were required to compete against one another.  The machines were networked together, and HEDA's expert testified that the software required that at least two players be logged on and playing the same game at the same time in order for the game to function.  One of the State's witnesses, however, testified that, following a search of Center Stage during which the gaming facility was cleared of all patrons, he was able to continue to play the electronic games by himself, without other players.  Furthermore, the evidence established that there was no way for a player to know how many other players he or she was competing against, or what players were involved in the same game.  Nor would a

losing player be able to identify who had won a particular game session, and players were not required to orally announce a win.

The State also seized three "Roubingo" tables from Center Stage. Roubingo is a table game that combines elements of roulette and bingo. A Roubingo table is covered in green felt and has a numbered grid arranged in three long vertical columns. To play, players must purchase betting chips, which he or she then wagers by placing the chips on the numbered grid. A "table boss," who oversees the play of the game, determines when betting is stopped. Instead of a roulette wheel, the table is equipped with a ball blower. The "table boss" activates the ball blower and then selects two balls -- a "B" ball and an "O" ball. The winning number is determined by matching the first number of the "B" ball with the last number of "O" ball. A player whose chips were placed on the winning number wins additional chips based on the amount of chips wagered.

The trial court evaluated both the electronic-gaming devices and the RouBingo tables and concluded that those "were not the game commonly or traditionally known as bingo."

1130388

First, the trial court addressed the electronic machines and each of the elements described in <u>Cornerstone</u> and reaffirmed in subsequent cases.

<u>Electronic Machines</u>

As to the first element,[7] which explains that the game is one that is played on "one or more cards" with certain characteristics, the trial court found as follows:

> "A. BINGO CARDS. [T]here are no cardboard, paper, or printed Bingo Cards utilized by the players in playing any of the electronic machines at the Center Stage facility. HEDA asserts that an electronic configuration of the Bingo Cards satisfies the initial requirement under <u>Cornerstone</u> that the games are played with 'cards.' The Court finds no Alabama precedent which adopts this line of reasoning. An animated portrayal of a Bingo Card does not satisfy the Bingo Card requirement of <u>Cornerstone</u>."

In its brief to this Court, HEDA argues that the term "bingo" does not refer to the "traditional ... play of bingo set out by the trial court in its order." See, e.g., HEDA's brief, at 33. Among other things, HEDA specifically argues

---

[7]In its brief, HEDA repeatedly refers to the elements listed in <u>Cornerstone</u> as "factors," perhaps implying that something less than all of them must be present in order for a game to qualify as the traditional game of bingo. These items are more properly referred to as "elements," in that, as noted, the game commonly or traditionally known as bingo includes "at least these six elements."

16

1130388

that the trial court erred in finding that the games here did not qualify as bingo because they were not played on "cards" that were "cardboard, paper, or printed." HEDA's brief, at 45.

The trial court's description of a game played with "cardboard, paper, or printed [b]ingo [c]ards" is in fact a description of the game "commonly or traditionally known as bingo" and comports with our fundamental holding in Cornerstone and subsequent cases that the term "bingo" must be "narrowly construed." Applying this principle, as well as the other rules of statutory construction discussed above, and in the absence of "language of a constitutional provision requir[ing] otherwise,"[8] we reject HEDA's argument that an electronic depiction of a bingo grid will suffice. We consider, therefore, as did the trial court, that the term "bingo" does in fact refer to such a card as the court described. See also Riley v. Cornerstone, 57 So. 3d 704, 734 (Ala. 2010) (recognizing that the traditional game of bingo is

---

[8]Compare Ex parte State, 121 So. 3d 337 (Ala. 2013) (noting language in Amendment No. 743, Ala. Const. 1901 (now Local Amendments, Greene County, § 1, Ala. Const. 1901 (Off. Recomp.)), applicable to Greene County that expressly provides for "electronic marking machines," while also noting the applicability of all the other elements of bingo).

17

1130388

one "that is not played by or within the electronic or computerized circuitry of a machine, but one that is played on physical cards (typically made of cardboard or paper)").[9] In other words, we find no error in the trial court's finding as to this element.

As to the second element, the trial court found as follows:

---

[9]The trial court's understanding is not only consistent with the tenet of "narrow construction," but also finds ample support in contemporary dictionaries. The American Heritage Dictionary 240 (2d college ed. 1991), for example, defines a "card" as a "[a] small, flat, usually rectangular piece of stiff paper or thin pasteboard." Other definitions include the following:

"Card: 'A usually rectangular piece of stiff paper, thin pasteboard, or plastic for various uses.'"

Random House Dictionary of the English Language (2d ed. 1987).

"Card: 'A flat piece of stiff paper or thin pasteboard, usually rectangular; used as a surface to write or draw upon, or for other purposes.'"

Oxford English Dictionary 888 (2d ed. 1989).

"Card: 'Printed stiff paper for games.'"

Encarta World English Dictionary (1999).

"Card .... a flat stiff usu. small and rectangular piece of material (as paper, cardboard, or plastic) usu. bearing information ..."

Merriam-Webster's Collegiate Dictionary 186 (11th ed. 2009).

18

1130388

"B. Alphanumeric or similar designations are randomly drawn and announced one by one. First the pace of the game is not controlled by an actual physical living announcer or caller of the randomly drawn Bingo Balls. The Bingo numbers are randomly selected by a computer chip or a chip located in the mother board of the server. This computer controls the speed of the draws, which is by its nature rapid and faster than any 'caller' could recognize. Considering the amendment in question on a narrow basis required by Cornerstone and precedent cases, this factor is not satisfied at any of the machine stations identified."

HEDA argues in its brief to this Court that the trial court erred by finding that the games were not bingo on the ground that they are not conducted "by an actual physical, living announcer or caller" who randomly draws and announces, one-by-one, the applicable alphanumeric designations. We reject HEDA's argument. First, the second element itself, as set out above, implicitly contemplates a "caller" of the nature described by the trial court: "Alphanumeric or similar designations are randomly drawn and announced one by one." 42 So. 3d at 86. This is particularly true in the context of our understanding, as expressed in Cornerstone, that the game commonly or traditionally known as bingo is one that, by its nature, involves meaningful human interaction. Furthermore, however, we made specific reference in the fifth element

19

stated in Cornerstone to the requirement that a player who believes he or she has won a game of bingo must declare this fact "to the other players and the announcer." We also noted in Greenetrack, Inc., that, "in Cornerstone, we explained that, among other things, the game commonly or traditionally known as bingo involved 'each player' utilizing a 'card' with a certain pattern and universe of alphanumeric or other designations and that each player must respond to the random drawings of these designations by an 'announcer' by manually marking this card." ___ So. 3d at ___ (footnote omitted) (citing Cornerstone, 42 So. 3d at 86). See also, e.g., Bingo Bank, Inc. v. Strom, 268 S.C. 498, 502, 234 S.E.2d 881, 883 (1977) (explaining that "[t]he game of bingo is played by the use of a 'Caller' who announces, one at a time, numbers drawn at random from a container into which has been placed numbered balls or objects for that purpose").

HEDA argues, as it does in response to many of the trial court's findings, that "if an actual living, physical announcer is required, this criterion can never be met by an electronic game and there would be no reason to apply Cornerstone to any machine or electronic device." HEDA's

brief, at 47. HEDA misunderstands the central import of our holding in <u>Cornerstone</u> and the cases decided since then: The game of bingo is in fact the game "commonly or traditionally known as bingo," i.e., one that does involve meaningful human interaction in a group setting, not one that is played within the circuitry of electronic machinery.

As to the third element in <u>Cornerstone</u>, the trial court stated:

> "C. Daubing or marking Bingo cards. These electronic devices fail to satisfy the daubing requirement enumerated in <u>Cornerstone</u>. The ball draw is rapid and there is no ability for the individual player to daub between the ball draws. Further, the machines allow only collective daubing of identified winning patterns not individual daubing of a single matching number. Indeed daubing is not required until the game is concluded and a winning pattern is identified by the machine."

HEDA argues that the trial court erred in focusing on the fact that "there is no ability for the individual player to daub between the ball draws." HEDA contends that "nothing in <u>Cornerstone</u> required daubing between ball draws." HEDA's brief, at 47. We disagree. As already noted, the second element requires that the alphanumeric or similar designations being used be randomly drawn and "announced one by one." 42

21

1130388

So. 3d at 86. Moreover, the third element, as noted, requires that players "must pay attention to the values announced." 42 So. 3d at 86. It clearly contemplates that, following each announcement of a value that matches a value on the player's card, "the player must physically act by marking his or her card." 42 So. 3d at 86. Obviously, if a player is to physically act by marking his or her playing card, he or she must have time to do so.

As to the fourth element, the trial court found:

"D. Requirement to pay attention and mark properly. In a traditional bingo game, the player is required to pay attention to the ball drawn by the caller and daubs, paints, or marks matching numbers on his cardboard card as they occur in anticipation of achieving a winning card. In this case the electronic machines or player stations at Center Stage are controlled by the computer chips and the electronic animations which are displayed by the computer and the computer predetermines the game-winning pattern. The player does not physically paint or write a matching number. In fact, the players interface with the computer does not require the players to display any particular attention or skill. This factor of Cornerstone is not satisfied by the electronic machines."

As to this element, HEDA takes issue with the trial court's finding that "the player does not physically paint or write a matching number" (emphasis in HEDA's brief), noting

22

no such requirement in the fourth element. Clearly, however, as stated previously in the same paragraph of its findings, the trial court applied a standard by which a player was required to "daub[], paint[], or mark[]" matching numbers. The essence of the trial court's finding as to this element was that there was no individual, one-by-one, physical marking of numbers by the player as the game progressed, and we find no error as to this issue.

HEDA insists, however, that the games meet the requirement of the fourth element that a player must "pay attention" and "properly mark" his card or run the risk of "miss[ing] an opportunity to be declared a winner." 42 So. 3d at 86. HEDA argues that this requirement is met by the fact that, at the conclusion of each game, a player is given 30 seconds to physically "press" a numeric pattern that has been electronically selected, recorded, and displayed to him or her in the span of several seconds. This, however, is not what was intended by the fourth element, particularly when that element is read in pari materia with the other elements.

The fourth element contemplates that, as alphanumeric or other designations are announced one by one, the player must

23

physically mark his or her card accordingly and "can fail to pay proper attention or to properly mark his or her card," 42 So. 3d at 86, in response to an announced value at the time it is announced. The games at issue in the present case do not contemplate one-by-one physical marking of the values announced, but, instead, provide by computer a preselected winning pattern, and give the player the winning pattern in its entirety, and then give the player 30 seconds in which to "press" that pattern. As the State notes: "[P]layers did not have to pay attention to the numbers drawn" and "could only mark winning patterns after the computer highlighted them" for the players.[10] As the trial court found, players had no control over the recognition of matching numbers or winning patterns. The computer identified matching numbers and winning patterns; the player was merely required to touch the winning numbers after the computer had identified them for the player. The trial court concluded that a game of this nature did not qualify as the game of bingo that has been described by this Court in Cornerstone and subsequent cases. We agree.

_____

[10]Further, the machines made it physically impossible to mark numbers on the grid unless the computer had identified those numbers as part of a winning pattern.

24

As to the fifth element announced in <u>Cornerstone</u>, the trial court found as follows:

"E. Recognizing a winning card and announcing before another player. While playing the machines in question the Player was not required to verbally announce to the other group of players that they had a winning pattern. In all of the games in question the individual player pushes a button to claim a prize. The evidence is clear that on these electronic devices the individual player and his play [are] controlled by computer software generated patterns which dictate the game. Each individual player is not required to identify any pattern of play to win. The player is not in control of the recognition factor. Hence there is no basis under the dictated play to verbally announce. The operation of the machines does not change the <u>Cornerstone</u> requirement that 'a player must recognize that his or her card has a Bingo.'"

HEDA argues that the trial court incorrectly injected the requirement of a "verbal announcement" into this element. We disagree. This, in fact, is exactly what was intended by the fifth element in <u>Cornerstone</u>, particularly when all six elements are read <u>in</u> <u>pari</u> <u>materia</u> and in the context of the fundamental principle that the game at issue is, in fact, "that game commonly or traditionally known as bingo." 42 So. 3d at 86. Listening for values that are "announced one by one," physically acting to mark one's card where appropriate

25

1130388

in response to each such announcement, and, upon discerning a winning pattern of markings, "announc[ing] to the other players and the announcer that this is the case before any other player does so," 42 So. 3d at 86, are all part of that traditional game. Moreover, as discussed below, the sixth element expressly provides that the game is, by definition, a "group activity."

In reference to the sixth element, the trial court found as follows:

"F. The group play and player competition. Cornerstone requires a group competition where a number of players are competing against each other in order to be first to mark their card and 'Bingo.' The traditional game of bingo is a group experience and it is easy to determine through visual observation that the group is playing one against another. There is no testimony or evidence in this case that proves this type of activity. Indeed, it is clear that a single player can win the game without other competitors being physically present. While these machines are networked through a common computer interface there is no demonstrative evidence that players are competing one against another. Indeed it may be a software configuration in these machines would prevent anything other than solitary play. The designer of the computer software in question was the person who identified how these games were to be played. But, there is no evidence that the group experience was contemplated in its operation."

26

HEDA takes issue with the reference by the trial court to a player's ability "to determine through visual observation that the group is playing one against another." Considering this language in context, we are clear to the conclusion that the trial court meant nothing more than what this Court itself intended when it stated in the sixth element identified in Cornerstone that "[t]he game of bingo contemplates a group activity in which multiple players compete against each other to be the first to properly mark a card with the predetermined winning pattern and announce that fact." 42 So. 3d at 86. Indeed, the full text of the sentence in which appears the allegedly offending language of the trial court is as follows: "[T]he traditional game of bingo is a group experience and it is easy to determine through visual observation that the group is playing one against the other." As the State argues, in the games at issue "players race only 'against the computer clock,' not against other players. Merely linking various terminals through a central server is not sufficiently like the traditional game of bingo to satisfy the sixth [element]." We agree and find nothing in the trial court's conclusions as to the sixth element warranting reversal.

In addition to the foregoing, HEDA argues that the State, in order to satisfy its burden of proof in this action, was required to offer expert testimony concerning the operation of the electronic-gaming devices. We disagree. The State offered ample, and mostly undisputed, evidence demonstrating the actual game play on the electronic devices at issue. That testimony included direct testimony from agents who had played the electronic devices and who had personal knowledge concerning how the games played as well as video footage of the games being played.[11] No expert technical testimony as to the specific operation of the circuitry or software was necessary to support the trial court's conclusions that the devices in question did not play the "game commonly or traditionally known as bingo."

The trial court concluded its order as follows:

_____

[11]HEDA also argues that there was no evidence indicating that the computer servers seized by the State constituted illegal gambling devices. The record, however, supports the trial court's conclusion that the computer servers seized in this case were related to the operation of the gaming machines. HEDA's own expert testified that servers were an integral part of the networked gaming systems. The testimony indicated that, as the servers at Center Stage were unplugged, the terminal screens in the gaming area began powering down or displayed a message that they were "searching for the server." Furthermore, the servers bore labels such as "Bingo I."

"It is clear that in this case the test factors identified in the Cornerstone case have not been fulfilled. ... Clearly the games that the players play at the machines at issue are not the same as the traditional game known as Bingo. Not only did they not qualify with the Cornerstone test, they place the computer-generated game into an area where the inception and termination of the game is not shown to the player. Each of the individual players has no knowledge of their competitors and no ability to identify any other player that might be competing against them. There is no way of verifying another players' bingo victory and essentially all human skill has been eliminated from this animated version of the game. The devices before this Court are not the ... traditional game known as 'Bingo' as defined by the Supreme Court."

"[T]he Constitution is not to have a narrow or technical construction, but must be understood and enforced according to the plain, common-sense meaning of its terms." Hagan v. Commissioner's Court of Limestone Cnty., 160 Ala. 544, 554, 49 So. 417, 420 (1909). As has been noted, "'[o]ur peculiar security is in the possession of a written Constitution. Let us not make it a blank paper by construction.'" Cole v. Riley, 989 So. 2d 1001, 1017 (Ala. 2007) (Bolin, J., dissenting and quoting Thomas Jefferson's letter to Wilson C. Nicholas, September 7, 1803, 10 The Writings of Thomas Jefferson 419).

"'Laws are made for men of ordinary understanding, and should, therefore, be

29

> construed by the ordinary rules of common sense. Their meaning is not to be sought for in metaphysical subtleties, which may make anything mean everything or nothing, at pleasure.'"

Id. (quoting Jefferson's letter to Judge William Johnson, June 12, 1823, 15 The Writings of Thomas Jefferson 449-50).

Further, as observed in Fraternal Order of Eagles Sheridan Aerie No. 186, Inc. v. State, 126 P.3d 847, 859 (Wyo. 2006): "'When we ascend to the bench we do not discard the ordinary common sense observations, experiences and intelligence of common men.'" (Quoting 37 Gambling Devices v. State, 694 P.2d 711, 717-18 (Wyo. 1985).)

In accordance with the foregoing, we reiterate today that the game traditionally known as bingo is not one played by or within an electronic or computerized machine, terminal, or server, but is one played outside of machines and electronic circuitry. It is a group activity, and one that requires a meaningful measure of human interaction and skill. This includes attentiveness and discernment and physical, visual, auditory, and verbal interaction by and between those persons who are playing and between the players and a person commonly known as the "announcer" or "caller," who is responsible for

calling out the randomly drawn designations and allowing time between each call for the players to check their cards and to physically mark them accordingly. In accordance with the previously stated list of characteristics, each player purchases and plays the game on one or more cards that, in a county such as Houston County (in which the amendment does not expressly permit "electronic marking machines"), are not electronic devices or electronic depictions of playing surfaces but are actual physical cards made of cardboard, paper, or some functionally similar material that is flat and is preprinted with the grid and the designations referenced above.

## Roubingo Tables

We turn now to the trial court's ruling that Roubingo did not constitute the traditional game known as bingo. The trial court held:

> "In addition to the electronic machines found at the Center Stage facility there were also other gambling devices utilized at the facility. One of these devices was a game identified as 'Roubingo.' These games were constructed in the form of a table configured in a similar fashion as the game of roulette; however, in this case the player purchased chips from a 'table boss' and waged a bet by placing the chips on a designated portion of the table. When all bets are made the dealer draws two balls

from a container blower located on the table.  Only these two balls are drawn and that determines the winner.  The determination of the prize is designated by the call and numeric value of the number where the player has deposited his chips, that is whether the number of the B ball and the last number of the O ball correspond with the wager made by the player.  Roubingo cannot be construed as the traditional Bingo game.  Bingo contemplates drawing of a number of balls to determine a winning pattern.  Playing this game is limited to a selection of two numbers.  There is no physical marking or daubing in this specific game.  Any identification or marking occurs when the chips are actually placed on the table in the respective number designation.  None of the elements of Cornerstone are complied with by this device.  It is illegal gambling cloaked in a 'Bingo' costume.  This game is not Bingo as the Supreme Court has defined that game."

HEDA argues on appeal that the Roubingo tables seized by the State in fact played the traditional game of bingo as defined by this Court in Cornerstone and that the trial court's decision is contrary to the great weight of the evidence presented at trial.  We disagree.  Based on our thorough review of the evidence and the testimony presented at trial, the trial court correctly ruled that the gaming devices at issue in this case did not play the game "commonly or traditionally known as bingo."[12]  42 So. 3d at 86.

---

[12]We do not mean to be understood as directly adopting the analysis of the trial court's order as to this issue.

32

1130388

B.  <u>Whether HEDA's property was exempt from forfeiture</u>.

Next, we turn to HEDA's argument that its property was exempt from the seizure and forfeiture provisions of Alabama's generally applicable antigambling laws, § 13A-12-20 et seq., Ala. Code 1975. Amendment No. 569 provides that the Houston County Commission "may promulgate rules and regulations for issuing permits or licenses and for operating bingo games within the county jurisdiction."  On February 8, 2010, the Houston County Commission promulgated a resolution regulating the operation of bingo in Houston County.  That resolution defined lawful "Bingo Equipment and Supplies" to include equipment used for playing electronic bingo:

> "'Bingo Equipment and Supplies' shall mean any electronic or mechanical equipment, machine or device, or computer or other technologic hardware or device, (i) which is installed, or is to be installed, at a bingo facility and (ii) which is used, or can be used to play Bingo as herein defined.  Bingo Equipment and Supplies includes any machine, device or hardware that assists a player in the playing of Bingo Games, broadens the participation levels in a common game and includes all of the ancillary Bingo supplies.  Examples of Bingo Equipment and Supplies include, but are not limited to, dispensers, readers, electronic player stations, player terminals, central computer servers containing random number generators and other processing capabilities for remote player terminals, electronic consoles capable of providing game results in different display modes, telephones and

33

telephone circuits, televisions, cables and other telecommunication circuits, and satellites and related transmitting and receiving equipment. Bingo Equipment shall not be deemed to be for any purpose a 'gambling device' or 'slot machine' within the meaning of the Code of Alabama 1975, Sections 13A-12-20(5) and (10) or any other provision of law, whether now in effect or hereafter enacted."

Resolution 10-10 (2010). The resolution further required that each electronic-gaming-device terminal operated under the resolution must bear an annually renewable "machine-bingo stamp." HEDA notes that each of the electronic-gaming devices at issue in this case bore a "machine-bingo stamp" paid for by HEDA and issued by Houston County.

HEDA calls our attention to the following portion of the implementing legislation enacted by the legislature:

"Any other law providing a penalty or disability on a person who conducts or participates in bingo games, who possesses equipment used in conducting bingo, who permits bingo to be conducted on his or her premises, or who does other acts in connection with bingo, shall not apply to the conduct when done pursuant to this act or rules promulgated under this act."

§ 45-35-150.15, Ala. Code 1975. HEDA contends that, because the electronic devices seized by the State were "equipment used in conducting bingo ... pursuant to ... rules promulgated under this act," the equipment was not subject to forfeiture

34

under § 13A-12-30. Accordingly, HEDA argues, the State's forfeiture action under § 13A-12-30 failed to state a claim upon which relief could be granted and should have been dismissed. We disagree.

Section 45-35-150.15 exempts persons from penalties associated with the operation or participation in "bingo games" as authorized by Amendment No. 569. In determining what constitutes a lawful "bingo" game under Amendment No. 569, this Court applies the analysis originally articulated in Cornerstone and summarized in Part III.A above. Notwithstanding a resolution to the contrary, to the extent that a gaming device does not meet the definition of bingo as authorized by Amendment No. 569, it remains a lottery prohibited under § 65 of the Constitution and, consequently, punishable under Alabama's generally applicable antigambling laws. In this case we affirm the trial court's holding that the gaming devices seized from Center Stage do not play the game of "bingo" as permitted by Amendment No. 569. Accordingly, the property in question was subject to forfeiture under § 13A-12-30.

C. Whether the use of electronic-gaming devices in Houston County has been "judicially validated."

Next, HEDA argues that "the use of electronic devices for playing bingo in Houston County has been judicially validated." HEDA's brief, at 29. Specifically, HEDA refers to a bond-validation proceeding related to the issuance of revenue bonds for the purpose of raising money to fund the multi-use entertainment complex known as the "Country Crossing Project" in Houston County, which would eventually include Center Stage. In 2008, the Houston County Commission established a public corporation known as the Cooperative District of Houston County for the purposes of issuing revenue bonds to develop the Country Crossing Project. A key component of the planned Country Crossing Project was an electronic-gaming center, and the revenue bonds were to be repaid, in part, by a special fee on each "charity bingo machine" operated within the project.[13]

The Cooperative District filed a bond-validation petition in the Houston Circuit Court pursuant to § 11-81-221, Ala. Code 1975. That statute allows a public corporation to

---

[13]The bond-validation order provided that the bonds would be payable, in part, from "the Entertainment Fees to be imposed by the Cooperative District on each and every charity bingo machine operated within the Cooperative District at a rate of $1,312 per machine per year."

36

"determine its authority to issue ... obligations and the legality of all proceedings had or taken in connection therewith," and "the validity of the tax or other revenues or means provided for the payment thereof." In October 2009, the Houston Circuit Court entered a final judgment confirming the validity and enforceability of the bonds issued for the Country Crossing Project. Upon the entry of a judgment validating the issuance of obligations issued under § 11-81-220 et seq., Ala. Code 1975, Alabama law provides:

> "[T]he judgment of the circuit court validating and confirming the issuance of the obligations shall be forever conclusive as to the validity of such obligations against the unit issuing them and against all taxpayers and citizens of each organizing subdivision, and the validity of such obligations or of the tax, revenues or other means provided for their payment and of any pledge, covenant or provision for the benefit of said obligations, to the extent that the validity of any such pledge, covenant or provision shall have been presented to the court and validated by its judgment, shall never be called in question in any court in this state."

§ 11-81-224, Ala. Code 1975.

Center Stage was constructed as part of the Country Crossing Project. HEDA therefore contends that the Houston Circuit Court's order validating the bonds used to finance the Country Crossing Project and approving the repayment of the

37

bonds from fees imposed on "each and every charity bingo machine" served as a "forever conclusive" judicial validation of HEDA's electronic-gaming operation. We disagree.

The final judgment in the bond-validation proceeding did not in any way decide the central legal issue before the trial court in this case -- the legality of the specific gaming devices operated by HEDA and seized by the State. The purpose of the bond-validation proceeding was to put to rest any question affecting the validity of the bonds. The legality of certain gaming machines or devices was plainly not a subject of those proceedings. Accordingly, we reject HEDA's contention that the judgment in the bond-validation proceeding is in any way dispositive of any issue in this case.[14]

D. Whether the currency and gambling records were proper subjects of the forfeiture petition.

Finally, HEDA argues that the trial court erred in granting the State's petition for forfeiture of the currency and gaming records seized from Center Stage. First, HEDA

---

[14]See also Redtop Market, Inc. v. State, 66 So. 3d 204 (Ala. 2010) (holding that a court lacks subject-matter jurisdiction to enter a judgment in a civil action declaring certain types of gambling devices legal so as to preempt future law-enforcement efforts that might be directed toward such machines).

argues that the State failed to prove that the currency seized had been used as bets or stakes in an illegal gambling activity. The trial court held:

> "All of the currency and gambling paraphernalia seized from the identified facilities at Center Stage are clearly connected with the overall gambling activity at the facility. The currency in question was confiscated from cash registers, cabinets and drawers in the cashiers area; the vault, two [automatic-teller machines] and in an office area. Agent Borland, the officer in charge of the currency seizure, carefully detailed the location, amounts and areas where currency was located. It affirmatively appears from the testimony that the currency in issue is clearly attributable to the illegal gambling at Center Stage."

Based on the record before us, the trial court's conclusion is not "contrary to the great weight of the evidence."

Likewise, the record supports the forfeiture of the documents and records seized from Center Stage. The State seized records related to winnings, advertising contracts, documents about contracts and pay rates for gaming systems, letters concerning Center Stage's tax status and operations, profit and loss statements, and federal W-2G forms used to report winnings to the Internal Revenue Service. The State also seized computers that contained electronic-gambling records. Section 13A-12-30 provides for the forfeiture of

39

gambling records possessed in connection with an illegal gambling operation. Because we are affirming the trial court's judgment holding that the activity at Center Stage constituted illegal gambling, the records related to that activity are also subject to forfeiture.

## IV. Conclusion

On the basis of the record before, we conclude that the trial court did not err in ordering the forfeiture of the items seized by the State from Center Stage. The judgment of the trial court is affirmed.

AFFIRMED.

Stuart, Bolin, Parker, Murdock, Main, Wise, and Bryan, JJ., concur.

Moore, C.J., and Shaw, J., concur in the result.